**SUPREME COURT OF THE STATE OF NEW YORK**
**COUNTY OF SULLIVAN**

----------------------------------------------------------X

BARBARA MEI and BRENDAN ELLIOTT;
RICHARD P. and JOAN G. O'LEARY;
JAMES A. BALLARD, JR.; WERNER and INGRID BANTIN;
CHARLES and DOROTHY BOYLE; JOSEPH and LINDA
BRANCATO; HELEN BRITTON; JOSEPH CAPRICHIO;
PATRICK F. CAREY; GESMONDA CASAZZA;
ROBERT R. CASE; MARY T. CHAIN; LAWRENCE CONKLIN;
CLIFFORD and DIANE COOPER; SALVATORE and LAURIE
CRIMANDO; BRAD CRONK, JASON and BROOKE CSENCSITS;
NANCY DALLAVERDE; ANN DALY; HUGH DELANEY; VINCENT and SHEILA
DIMAGGIO; PATRICK J. DOCKERY; MARSHA DOLEE; PETER and NATALKA
DOROSZ; ELFRIEDE EBNER; KENNETH J. and LYNNE EDWARDS;
BARBARA FEINBERG; RAYMOND and ELIZABETH FERNEKES;
JOSEPH and BERNICE FLYNN; VINCENT C. and KATHLEEN GALLIGAN;
HELEN V. GARRITY; DANIEL J. GRUSZ; ROBERT and ALICE HAHN;
LILLIAN HARPER; CHARLES and MAUREEN HILDEBRANDT; GEORGE and JANE
HOROS; MARK and PAM HOUSE; LORRAINE HOWELL; WILLIAM HOWELL;
CRAIG W. HURTAK; KAREN and LOUIS INNIELLA; DOMINICK and
ELAINE IOCCO; ROBERT JONES; BOB KEENER; TOM and PAT KIERNAN;
RICHARD KING and DARLENE STOFFEL; DOUGLAS A. KIRK; FRED A. KURZROCK,
JR.; JAMES and VICTORIA KURZROCK; JOAN L. KURZROCK; THERESA KUTZLER;
TED and GEORGINA KUYKENDALL; STEVEN LASCH; CHERYL LEE; VIRGINIA
LEITH; WILLIAM T. LLOYD; EDWARD and LOUISE LUKAS; WILLIAM MARION, SR.;
DOUGLAS MARTIN; ROBERT and EUNICE MAY; WILLIAM T. and LARISA MCCUE;
GERALD and MARIE MCDERMOTT; JOHN J. MCINTYRE; ROBERT C. MCMILLEN, JR.;
LINDA MENYHART; KURT and OLY MEYER; DENNIS J. and GLORIA MORAN; TIM and
CAROL MOUL; DONALD and VIRGINIA MOYSON; JOHN MULVEY; MYRON MYRON;
LESTER R. NEWELL; NEVERSINK RIVER CAMPOROUND, INC. c/o JULIA DOLGAS,
SECRETARY; DAVE and JANE NORTON; MICHAEL and CHRISTINE O'LEARY;
RICHARD A. and KRISTINE O'LEARY; RICHARD A. O'LEARY; TIM O'LEARY;
ROBERT OSTROM; DEBBIE PALLAS; JOHN H. ROBB and ALBERTA BRIGHTON;
ANTHONY and CHRISTINE ROUSSOS; MICHAEL RUEF; SALVATORE C. RUSSO;
CHRISTOPHER and MARCIA SCHAEFER; KEVIN L. SCHOOMAKER;
EDWIN SIWARSKI; PETER SLIKER; MARILYN J. SPEBBER; KEVIN and MONICA
STEWARD; DOUGLAS and TRICIA STORMS; GERILYN TAINSKY; ROLAND and
VERONICA TALMADGE; DEREK and NANCY TOLLESON; MICHAEL T. VALENTIA;
JEROME and LOUISE VANDEMARK; BRIAN VAN DEWEER; TERRANCE and AGNES
VAN STRANDER; WILLIAM VERNI; DEBBIE WALSH; WILLIAM J. WILLIAMS; AND
ROBERT J. ZELLER; ON BEHALF OF THEMSELVES AND ALL OTHERS SIMILARLY
SITUATED

                                                              Plaintiffs,

        -against-

THE CITY OF NEW YORK, AND ITS AGENCIES AND BUREAUS INCLUDING
WITHOUT LIMITATION, THE CITY OF NEW YORK DEPARTMENT OF
ENVIRONMENTAL PROTECTION

                                                              Defendant.

----------------------------------------------------------X

**COMPLAINT**

**INDEX NO.:** 3398/0.

**ASSIGNED JUDGE:**

DEC-19-2005  10:51        NYC D.E.P.                                5953477    P.03/25

The Plaintiffs, by their attorneys SPIEGEL & JONES, LLP, on behalf of the named Plaintiffs, and, pursuant to CPLR Article 9, on behalf of all others similarly situated, as and for their Complaint against Defendant, allege and state:

## THE PARTIES

1.      At all times hereinafter relevant, the Plaintiffs were and continue to be owners or residents of property located within the County of Sullivan and/or County of Orange, State of New York. For the property address of each individual Plaintiff, see Exhibit "A" annexed hereto and made a part hereof.

2.      At all times hereinafter relevant, Defendant, THE CITY OF NEW YORK, and its agencies and bureaus including without limitation, The City of New York Department of Environmental Protection (hereinafter individually and collectively, "THE CITY" or the "Defendant") was and continues to be a municipal corporation, duly licensed and authorized to transact business within the State of New York, with its principal place of business located at 1 Centre Street, New York, New York 10007.

## FACTS COMMON TO ALL CAUSES OF ACTION

### The Neversink: A River, A Reservoir, A Dam

3.      At all times hereinafter relevant, each of the Plaintiffs owned or resided in property adjacent to or near the Neversink River, and each Plaintiff suffered damage in the flooding of the Neversink River which occurred on or about April 2 through April 4, 2005.

- 2 -

DEC-19-2005  10:52        NYC D.E.P.                              5953477    P.04/25

4.   At all times hereinafter relevant, THE CITY was the owner of certain real property located within the County of Sullivan, generally known as the Neversink Reservoir and the Neversink Dam.

5.   At all times hereinafter relevant, THE CITY owned the improvements, buildings, structures, machinery, valves, and other mechanical, plumbing, hydrological and electrical devices appurtenant thereto, and/or used in connection with, the operation of the Neversink Reservoir and the Neversink Dam.

6.   At all times hereinafter relevant, THE CITY, through their administrative agency The City of New York Department of Environmental Protection ("DEP") operated the Neversink Reservoir and the Neversink Dam, along with the adjacent buildings, structures, machinery, valves, aqueducts, and other mechanical, plumbing, hydrological and electrical devices appurtenant thereto and/or used in connection therewith.

7.   The Neversink Reservoir is the source of water for the Neversink River.

8.   The Neversink Dam is located at the southern end of the Neversink Reservoir, and the Neversink Dam separates the Neversink Reservoir from the Neversink River. The Neversink River flows south through Sullivan County, through Orange County, and ultimately joins with the Delaware River at Port Jervis, New York.

9.   Since the creation of the Neversink Reservoir and the Neversink Dam, the Neversink River no longer flows freely, *currere solebat*, subject only to the natural elements and Acts of God. Now, the releases, spills and leakage from the Neversink Reservoir and Neversink Dam determine the flow of water in the Neversink River, as such flow can be measured by volume, velocity and temperature.

- 3 -

DEC-19-2005  10:52        NYC D.E.P.                              5953477    P.05/25
ㄷㅁ·ㅓ        ㅊㄹ6        ㄱ614565ㄹ794        ㄸㄹ:91 500ㄹ-91-ㅗㄹㅁ

### THE CITY's Reservoir Policy: "Fill and Spill"

10.     On April 2 through April 4, 2005, and prior thereto, THE CITY did not adopt or employ a water management program with respect to the Neversink River, based in whole or in part on the River's impact from the use and operation of the Neversink Reservoir or the Neversink Dam.  THE CITY's failure to adopt or employ a water management program includes, without limitation, the failure to adopt or employ either (a) a flood management and control program, (b) an emergency evacuation and safety program, and/or (c) a river ecology management program.

11.     On April 2 through April 4, 2005, and prior thereto, THE CITY's policy with respect to the Neversink Reservoir and the Neversink Dam, and the water released into the Neversink River, was characterized by THE CITY as a "fill and spill" policy. This "fill and spill" policy means that, except for certain minimum water releases mandated by an Amended Decree of the Supreme Court of the United States (pursuant to *State of New Jersey v. State of New York and City of New York*) dated June 7, 1954 (the "Amended Decree"), THE CITY "fills" the Neversink Reservoir until it "spills" over into the Neversink River.

12.     The sole and exclusive purpose of this "fill and spill" policy was to preserve every last drop of water for THE CITY's reservoir system, except as specifically mandated by the Amended Decree.

13.     This "fill and spill" policy did not consider, address or account for the policy's affect or impact upon river flooding, safety of downstream river residents and communities, and/or river ecology, with respect to the Neversink River and the persons, property, flora, fauna, aquatic life, and/or riverbed, on or near the Neversink River.

- 4 -

ㄷㄷ/ㄷㅁ  ㄷㅋㄷ:ㅁN  ㅁㅓ:ㄷ1  ㄷㅁ  ㄷ1/ㅓ1        ㅂ614565ㄹ94        ㅁㅁㅁㄹㅗㅓㄹㄹㄷㅁㅁㅁ

14.     This "fill and spill" policy did not consider, address or account for the policy's affect or impact upon the maintenance and repair of the Neversink Dam itself.

### *THE CITY's Maintenance of the Dam and the Reservoir Systems*

15.     The construction of the Neversink Dam began in 1941 and was completed in 1953, at which time water was diverted from the Neversink River.

16.     The Neversink Dam is an earthen dam structure.

17.     The normal life expectancy of an earthen dam structure is fifty years. Based on the construction of the Neversink Dam, the normal life expectancy would therefore be sometime between 1991 (fifty years after the date that dam construction commenced) and 2003 (fifty years after the date that dam construction was completed).

18.     On April 2 through April 4, 2005, and prior thereto, THE CITY did not employ a regular maintenance schedule for the Neversink Dam.

19.     On April 2 through April 4, 2005, and prior thereto, THE CITY did not employ a regular maintenance schedule for all of the improvements, buildings, structures, machinery, valves, and other mechanical, plumbing, hydrological and electrical devices appurtenant to, and/or used in connection with, the operation of the Neversink Reservoir and the Neversink Dam.

20.     At all times hereinafter relevant, the Rondout Aqueduct was owned and operated by THE CITY.

21.     An aqueduct (hereinafter "Rondout Aqueduct") runs from the Neversink Reservoir to the Rondout Reservoir, where water is transferred and stored before being further diverted to THE CITY itself. The Rondout Aqueduct diverts water 'from the

- 5 -

DEC-19-2005 10:52       NYC D.E.P.                                    5953477   P.07/25

Neversink Reservoir, and therefore assists in preventing "spillage" at times when the Reservoir is filled to capacity.

22. On April 2 through April 4, 2005, and for at least the month prior to such dates (i.e., throughout March 2005), the Rondout Aqueduct was closed.

23. Upon information and belief, the Rondout Aqueduct was closed based on either (a) the failure of THE CITY to timely negotiate a contract with a hydroelectric service provider and/or (b) THE CITY's decisions to make an elective, non-emergency repair to a valve on the Rondout Aqueduct.

### April 2-4, 2005: Rainfall, Snowmelt, and an Overtopped Reservoir

24. Prior to March 28, 2005, the Neversink Reservoir was already filled, and already spilling continuously.

25. THE CITY knew or should have known that all additional water entering the Neversink Reservoir, whether from rain or snowmelt, would be spilled from the Neversink Reservoir into the Neversink River, unless THE CITY diverted water from the Neversink Reservoir. THE CITY made no attempt to divert water from the Neversink Reservoir during the month prior to March 28, 2005.

26. A rainstorm on March 28 through March 29, 2005, contributed approximately 2.12 inches to the already-filled Neversink Reservoir. The Neversink Reservoir spilled continuously during that rainstorm, and continued to spill from that time through and including the rainstorm of April 2 to April 4, 2005.

27. The snowmelt associated with the spring thaw of March and April 2005 contributed approximately 7.8 billion gallons of water to the Neversink Reservoir. This

- 6 -

DEC-19-2005  10:53      NYC D.E.P.                                    5953477   P.08/25
80˙d                    %ZS         ⫫6Z⫫595⫫16             DEC-16-2005  16:31

annual spring thaw snowmelt is carefully measured by federal agencies and other entities that supply information on snowmelt to THE CITY, and THE CITY knew or should have known that this snowmelt would continue to fill the Neversink Reservoir.

28.     THE CITY knew or should have known, prior to March 28, 2005: (i) of the potential for flooding of the Neversink River, as a result of the predicted rainstorm weather patterns and the snowpack melt based on, among other things, predictions of the National Weather Service, (ii) that the Neversink Reservoir would continue to fill and spill, and (iii) that "hording" of water in the Neversink Reservoir to preserve every drop of water for the reservoir system was unnecessary given the continued inflow of water into the Neversink Reservoir.

29.     Despite these warnings and predictions of flooding for the Neversink River, and despite prior knowledge of anticipated rainstorms and the certainty of snowmelt, THE CITY made no attempt to gradually release water from the Neversink Reservoir or otherwise divert water from the Neversink Reservoir, for purposes of water management or otherwise. Despite these warnings, predictions and prior knowledge, THE CITY even closed pre-existing diversions like the Rondout Aqueduct, for non-emergency repairs, further ensuring that the Neversink Reservoir would continue to "fill and spill" as the result of predicted rainfall and predicted snowmelt.

30.     Flood management, by releasing waters in reservoirs ahead of anticipated snowmelt, was a sound water management practice already well understood by THE CITY.

31.     THE CITY had a flood management program to release and divert water, in advance of anticipated spring snowmelt, at the nearby Pepacton Reservoir but, in the midst

- 7 -

of anticipated rainstorms and snowmelts, even this program was discontinued on March 31, 2005, in favor of THE CITY's "fill and spill" policy. Even though the flood management program at Pepacton was prematurely discontinued, prior to the first rainstorm, on March 27, 2005, the Pepacton Reservoir was reduced to 92.4% of capacity (still a very large void for containing the coming rain and snowmelt —storage for about 10.6 billion gallons); by contrast, the Neversink Reservoir was at more than 100% of capacity on March 27, 2005, and could absorb no more water without spilling.

32.     Approximately 3.5 inches of rain fell into the Neversink Reservoir during the rainstorm of April 2 through April 4, 2005. The Neversink Reservoir, already filled to capacity, was continuously spilling during this time, with new rain and snowmelt runoff continuously entering the reservoir.

33.     Upon information and belief, in the years prior to 2005, the Neversink Reservoir was able to absorb most of the early spring rainfall and snowmelt, because THE CITY intentionally diverted water from the Neversink Reservoir. In such years past, THE CITY diverted the water of the Neversink Reservoir into the Rondout Reservoir for drinking water purposes, in early spring of each season. Indeed, water from the Neversink Reservoir was diverted to THE CITY, via the Rondout Aqueduct, ahead of the other reservoirs in THE CITY's vast reservoir system, because the waters of the Neversink Reservoir were generally considered to be the highest quality water in THE CITY's reservoir system.

34.     Upon information and belief, this historical early spring diversion of the Neversink Reservoir, for drinking water purposes, left the Neversink Reservoir at approximately 80% of capacity, on average, as opposed to the more than 100% of capacity in

- 8 -

April 2005. In April 2005, however, no water was being diverted from the Neversink Reservoir to the Rondout Reservoir, because the Rondout Aqueduct was out of service.

35.    As a result of the over-filling of the Neversink Reservoir, the Neversink Reservoir continued to spill across the Neversink Dam, and to the Neversink River, at all times from April 2 through April 4, 2005.

### April 2-4, 2005: "Fill and Spill" Threatens the Dam, and Floods the River like a Tsunami!

36.    As noted in Paragraphs 16 and 17 above, the Neversink Dam is an earthen structure with a limited life expectancy, and, as noted in Paragraphs 18 and 19 above, the Neversink Dam and the systems and structures appurtenant thereto were not regularly maintained.

37.    Apart from having limited life expectancies, of approximately fifty years, earthen dam structures are also at significant risk for catastrophic dam failure and/or collapse. In the event of such earthen dam failure and/or collapse, the reservoir would no longer be contained by the earthen dam, and would empty its waters into the river below, at great velocity, and at great consequence to life and property to the downstream Neversink River inhabitants, as has been the case with numerous earthen dam collapses (including the notorious Johnstown flood disaster in Johnstown, Pennsylvania, in 1889, where the failure of an earthen dam released 20 million gallons of water at speeds of 40 miles per hour, killing 2200 people and leveling everything in its path).

38.    The Neversink Reservoir holds approximately 34.9 billion gallons of water, is contained by the 195 foot high Neversink Dam, and is located at an elevation of 1,440 feet (the City of Port Jervis, downstream on the Neversink River, is at an elevation of 442 feet).

DEC-19-2005   10:53        NYC D.E.P.

5953477   P.11/25

It is both the volume and velocity of water surging from a failed or collapsed dam that creates the possibility of catastrophic damage, more like a tsunami than a lazy river flood. The elevation of the dam in relation to the elevation of the downstream river population center, and the volume of water released, all determine the velocity of the water and the magnitude of the damage.

39.   The risk of catastrophic earthen dam failure and collapse is significantly increased as the result of "fill and spill" policies. Reservoirs filled to capacity place additional stress and pressure on earthen dams, and spillage over the top of earthen dams hastens the decline in the dam's integrity. The Johnstown flood resulted primarily from the "overtopping" failure of an earthen dam. These dangers and risks of "overtopping" are further increased when spillage occurs for lengthy periods of time, when spillways become obstructed, when other discharge systems are inadequate, and also when spillage occurs at high velocities, such as during a protracted windstorm, rainfall and snowmelt scenario.

40.   THE CITY knew, or should have known, of the significantly increased risks of catastrophic earthen dam failure and collapse associated with a "fill and spill" policy with respect to the Neversink Dam, especially as the result of an "overtopping" failure during a storm event. These "overtopping" failures of earthen dams are not rare or isolated occurrences, and were well known to the DEP administrators and officials of THE CITY. For example, in nearby Sussex County, New Jersey, an "overtopping" failure during a large storm event in August 2000 resulted in the failure of Tomahawk Lake Dam in Byram Township.

- 10 -

41.    Despite knowing the risks that overtopping, especially during a large storm event, posed to the Neversink Dam —and to persons and property downstream on the Neversink River should the dam fail— THE CITY did not make any attempt to reduce the water level of the Neversink Reservoir in advance of the expected rainfall and snowmelt of late March and early April 2005. Without limitation of the foregoing, and in furtherance of their "fill and spill" overtopping policy, THE CITY made no attempt either to increase water releases from the Neversink Reservoir into the Neversink River in slow and steady intervals prior to April 2 through 4, 2005, and/or to release water from the Neversink Reservoir through the Rondout Aqueduct as was historically the case in March and April of years prior to 2005.

42.    Upon information and belief, as the Neversink Reservoir continued to "fill and spill" during April 2 through April 4, 2005, THE CITY at some point became concerned about the growing possibility of catastrophic earthen dam failure and collapse of the "overtopped" Neversink Dam.

43.    Upon information and belief, between April 2 and April 4, 2005, THE CITY elected to open release valves located at or near the base of the Neversink Dam. The opening of such release valves at the base of an earthen dam is an emergency safety protocol to reduce pressure on an earthen dam that is in danger of catastrophic earthen dam failure and collapse, and such action would be consistent with THE CITY's concern about the possibility of catastrophic earthen dam "overtopping" failure and collapse of the Neversink Dam, as water surged over the top and sides of the dam.

- 11 -

44.     By opening release valves located at or near the base of the Neversink Dam, THE CITY released a torrent of water, in both volume and velocity, into the Neversink River. This torrent of water, comparable to a tsunami or storm surge in a hurricane, threatened life and property, downstream on the Neversink River, at levels not characteristic of mere rising floodwaters.

45.     Upon information and belief, THE CITY was unable to shut these release valves located at or near the base of the Neversink Dam once they were opened, and, upon information and belief, THE CITY opened the valves still further, in an attempt to regain control of the mechanisms of the valves.

46.     The mechanical failures of these valves were directly attributable to THE CITY's failure to maintain these valves by regular cleaning of the accumulated silt and debris, as part of THE CITY's failure to adopt a regular maintenance program with the respect to the Neversink Dam and its structures and systems.

47.     THE CITY's failure to regularly remove silt and debris from these valves also contributed to another well-known risk of catastrophic dam failure, described generally as "seepage failures". By allowing water to seep through controlled valves, reservoir water is less likely to seep through the dam or its foundation. When these valves become clogged, seepage through the dam and its foundation accelerates, eventually producing a phenomenon known as "piping" which leads directly to catastrophic failure of the dam. Pressure from overfilled reservoirs, and the failure to regularly maintain valves and remove accumulated silt therein, only accelerates the risks of seepage and piping. THE CITY's failure to remove silt and debris from the release valves at or near the base of the Neversink Dam forced THE

- 12 -

CITY to open the valves fully during the rainstorm of April 2 to 4, 2005, creating torrents of water surging downstream into the Neversink River.

48. ·    Upon information and belief, THE CITY suspected seepage failure in the Neversink Dam, and observed sinkholes in the ground downstream of the Neversink Reservoir, which are characteristic of seepage failure. Upon information and belief, THE CITY dug test holes based on the observance of sinkholes following the rainstorm of April 2 through 4, 2005. THE CITY was also aware of the presence of sinkholes at the nearby Swinging Bridge Reservoir, also an earthen dam structure. On May 5, 2005, these sinkholes forced the lowering of the water level in the Swinging Bridge Reservoir by the Federal Energy Regulatory Commission, which oversees the Swinging Bridge Reservoir. Lowering of water level is inconsistent with THE CITY's "fill and spill" policy, which aims to preserve every last drop of water for THE CITY's reservoir system, and, accordingly, has been actively resisted by THE CITY's DEP administrators.

*The Tsunami-like Floods From the Overfilled Reservoir Damaged the Plaintiffs*

49.    The floods occurring on the Neversink River on April 2 through 4, 2005 were not characteristic of mere rising waters that occur on a river during a rainstorm. The volumes and velocities of the floodwaters on the Neversink River, including without limitation a "wall of water" moving down the Neversink River from the Neversink Reservoir, were instead the result of voluntary and/or involuntary releases and spills from the Neversink Reservoir resulting from THE CITY's "fill and spill" policies, practices, and maintenance failures.

- 13 -

50.    THE CITY failed to notify Plaintiffs of these releases and spills from the Neversink Reservoir, and the affect of such releases and spills on the Neversink River and residents adjacent thereto, including, without limitation, general notices of flood evacuation and emergency flood safety plans, and/or specific notice of the need for emergency releases of water from the Neversink Reservoir in order to avoid catastrophic dam failure and collapse.

51.    The water levels at the peak of the April 2 through 4, 2005 rainstorm were in excess of the "100 year" flood markers. Upon information and belief, the April 2 through 4, 2005 rainstorm did not, however, qualify as even a "50 year" storm. Indeed, only with a release of water from the Neversink Reservoir by THE CITY could the water level have reached or exceeded the "100 year" flood marker levels for the Neversink River — upon information and belief, the "100 year" flood markers for the Neversink River were themselves established by a release of water from the Neversink Reservoir by THE CITY in 1955, not by a naturally occurring flood event.

52.    Rainstorms in October 2005 produced significantly greater rain, yet, in contrast to April 2005, no significant flooding occurred on the Neversink River, and the "100 year" flood markers were not approached.

53.    Upon information and belief, the post-dam flow of the Neversink River is just twenty percent (20%) of the pre-dam flow of the Neversink River. By diverting the waters of the Neversink River for in excess of fifty years, THE CITY has altered the natural flow of the Neversink River as it was wont to run *(aqua currit at debet currerre, ut currerre solebat),* and, having altered the river's natural flow, is now responsible for the flow of the Neversink

- 14 -

River, since spills and releases by THE CITY from the Neversink Reservoir into the Neversink River now determine the level of the Neversink River, whether the Neversink River floods, and the safety and well-being of the persons, property, flora, fauna, aquatic life, and/or riverbed, on or near the Neversink River.

54.     The rate of water flow on the Neversink River during the April 2 through 4, 2005, flood, was far in excess of the velocity during a normal rainstorm. The velocity of water during a flood is a material factor in the damage caused by floodwaters, comparable to a "storm surge" during a hurricane or a "tsunami" event. This velocity resulted from the spillage and release of water from the Neversink Reservoir into the Neversink River.

55.     As a result of the increased volume and velocity of the waters of the Neversink River between April 2 through April 4, 2005, Plaintiffs sustained serious and severe damage including, but not limited to: (a) Diminution or loss in value of real property, improvements, hereditaments, easements, riparian and water rights, furniture, fixtures, equipment, chattels, and personal property, and/or diminution or loss of market values in connection with the foregoing, and/or costs and expenses necessary for the repair, restoration, clean-up, rehabilitation or replacement, in connection with the foregoing, by reason of, inter alia, loss of habitability; inability to reside at the damaged premises; loss of use and/or enjoyment; erosion of soil, rock and/or riverbanks; loss and/or scarring of land and acreage; loss of natural water course; loss of recreational and environmental access and opportunities; loss of landscape, trees, vegetation and shade; loss of fish and game stocks and wildlife, and suitable habitat in connection with the same; increase in silt and debris; increase in mosquitos and other pests; loss of lateral and subjacent support; loss of heirlooms,

- 15 -

Case 1:06-cv-00296-RPP   Document 1-2   Filed 01/13/06   Page 16 of 24
DEC-19-2005   10:55          NYC D.E.P.

5953477   P.17/25

personal memorabilia, and intangibles; remapping of flood lines and plains; inability to obtain flood insurance; market insecurity with respect to future releases, spillage and/or discharges of water, and/or total collapse of the Neversink Dam, as a result of acts or omissions of THE CITY; and market affects of present and future environmental and ecological damage to Plaintiffs' property and to the Neversink River; (b) Costs and expenses in connection with evacuation, relocation, temporary housing, dispossession, and/or moving; (c) Loss of wages or income; (d) Loss of quality of life, and psychological injuries consistent with Plaintiffs' damages; (e) Ongoing expenses and damages in connection with THE CITY's policies and procedures associated with the Neversink River and the Neversink Dam, and/or (f) Other damages or injuries consistent with the above.

56.    The named Plaintiffs have each timely filed a Notice of Claim with THE CITY, in accordance with legal requirements and legal conditions precedent to this action. The named Plaintiffs bring this action together pursuant to the principle of joinder and/or pursuant to Article 9 of the CPLR. Class action status is appropriate for the named Plaintiffs based on the criteria described in the following Paragraph.

57.    The named Plaintiffs bring this action not only on behalf of themselves, but also on behalf of all others similarly situated. A class action pursuant to Article 9 of the CPLR is appropriate for such other parties similarly situated, but not named specifically in this action, because, inter alia: the class of plaintiffs is so numerous that joinder of all members is impracticable; there are questions of law or fact which predominate over any questions affecting only individual members; the claims of the Plaintiffs are typical of the claims of the class; the Plaintiffs will fairly and adequately protect the interests of the class;

- 16 -

and a class action is superior to other available methods for the fair and efficient adjudication of the controversy. Moreover, those parties similarly situated to the named Plaintiffs may not even be aware that their damages by flooding, in connection with the rainstorm of April 2 through April 4, 2005, were caused by the acts or omissions of THE CITY.

58.     If class certification pursuant to Article 9 of the CPLR is timely granted, then those parties similarly situated to the named Plaintiffs will be able to timely file a Notice of Claim with THE CITY, to the extent that such Notice of Claim was not previously filed with THE CITY and/or THE CITY was not previously notified of the existence of such claims of parties similarly situated to the named Plaintiffs. THE CITY was timely notified of the existence of such parties similarly situated to the named Plaintiffs, and a Notice of Claim was timely filed on behalf of "Neversink Flood Victims" and on behalf of up to 5,000 claimants fictitiously named "John Doe" and up to 5,000 claimants fictitiously named "Jane Doe".

59.     The damages suffered by Plaintiffs were caused, in whole or in part, by the negligent, reckless, careless and/or intentional acts and/or omissions of THE CITY, its officers, agents, servants and/or employees. Plaintiffs have sustained damages in accordance with the proof to be provided at trial.

## COMMON LAW CLAIMS

60.     Plaintiffs repeat and reallege the allegations contained in Paragraphs 1 through 58 above, as if the same were fully set forth herein at length.

- 17 -

DEC-19-2005 10:56    Case 1:06-cv-00296-RPP    Document 1-2    Filed 01/13/06    Page 18 of 24
NYC D.E.P.

5953477    P.19/25

61.    The Defendant, its officers, agents, servants and/or employees acted, or omitted to take actions, intentionally, or were careless, reckless, and/or negligent in so acting or omitting to take actions, including, without limitation, in: (a) operating, maintaining and/or repairing the Neversink Reservoir, and/or the Neversink Dam, and/or improvements, structures, machinery, devices and systems appurtenant thereto or used in connection therewith, to the damage and detriment of Plaintiffs; (b) failing to utilize other improvements, structures, machinery, devices and systems which would have adequately protected Plaintiffs; (c) failing to employ and/or enact a water management program, including without limitation a flood management and control program, an emergency evacuation and safety program, and/or a river ecology management program; (d) failing to develop additional sources of potable water for New York City; (e) spilling, collecting, releasing, diverting, altering, and/or discharging water from the Neversink Reservoir into or upon the Neversink River, and the riverbed, lands and communities adjacent thereto or affected thereby, all without regard to such water's and River's volume, velocity and character, including without limitation the character of the water's flow, temperatures, quality, stages, channels, directions, silting, erosion, habitat, all of which has and will continue to have environmental, recreational, economic and/or ecological impacts, and all of which was done without regard to the natural flow and character of the Neversink River as it was wont to run, *aqua currit et debet currere, ut currere solebat* ; and/or (f) trespass in connection with said spilling, releasing and/or discharging of water; each and all of which intentional, careless, reckless and/or negligent acts or omissions, (a) through (f), were to the damage and detriment of Plaintiffs, and persons, property, flora, fauna, and aquatic life in,

- 18 -

on, or situated near, the Neversink River.

62.    The damages suffered by Plaintiffs were caused, in whole or in part, by the negligent, reckless, careless and/or intentional acts and/or omissions of THE CITY, its officers, agents, servants and/or employees. Plaintiffs have sustained damages in accordance with the proof to be provided at trial.

## STATUTORY CLAIMS

63.    Plaintiffs repeat and reallege the allegations contained in Paragraphs 1 through 58 above, and Paragraph 61 above, as if the same were fully set forth herein at length.

64.    By acting, or by omitting to take actions, as described in Paragraph 61 and the preceding Paragraphs above, and by failing to exercise reasonable care, prudence and diligence in the safe operation of the Neversink Dam and the Neversink Reservoir, Defendant, its officers, agents, servants and/or employees, have failed to comply with numerous Federal, New York State, New York City and local statutes, ordinances, rules, regulations, and judicial orders and directives, including without limitation, the following: (a) Title 42, regarding the Public Health and Welfare of the United States Code, including without limitation Section 1983; (b) the New York State Environmental Conservation Law; (c) the Dam Safety and Security Act of 2002 of the United States of America; (d) the Water Resources and Development Act of 1996 of the United States of America; (e) the Conservation Law of the United States of America, including without limitation Title 16, Section 469 and 1278 of the United States Code; (f) the Federal Occupational Safety and

- 19 -

Health Regulations; (g) the Industrial Code of the State of New York; (h) the Navigation and Navigable Waters Section of the United States Code, including without limitation Subchapter VII of Chapter 9, Title 33 of the United States Code, with respect to dam safety inspection programs; (i) the Federal Clean Water Act under Title 33 of the United States Code; (j) the National Environmental Policy Act under Title 42 of the United States Code; (k) National Wild and Scenic Rivers Act of 1968 under Title 16 of the United States Code; (l) the Endangered Species Act of 1973 under Title 16 of the United States Code; (m) the Public Trust Doctrine; (n) the Administrative Code of the City of New York; (o) the Constitution of the United States of America; (p) the Constitution of the State of New York; (q) numerous State and local statutes, ordinances and judicial directives, related to the taking of New York State lands by THE CITY, and related to the maintenance of THE CITY's reservoir system in Sullivan County and other upstate New York counties and municipalities; and/or (r) the Amended Decree of the Supreme Court of the United States, and judicial directives, decrees, orders and holdings in connection therewith; each and all of which violations of statutes, ordinances, rules, regulations, and judicial orders and directives, (a) through (r), were to the damage and detriment of Plaintiffs, and persons, property, flora, fauna, and aquatic life in, on, or situated near, the Neversink River.

65.     The damages suffered by Plaintiffs were caused, in whole or in part, by the negligent, reckless, careless and/or intentional acts and/or omissions of THE CITY, its officers, agents, servants and/or employees. Plaintiffs have sustained damages in accordance with the proof to be provided at trial.

- 20 -

WHEREFORE, the Plaintiffs demand judgment against the Defendant as follows:

a.    That the Plaintiffs, and each member of the class, recover monetary damages from the Defendant for the wrongs complained, in accordance with the proof to be provided at trial;

b.    That the Plaintiffs, and each member of the class, be granted such injunctive and other equitable relief by this Court as appropriate to prevent Defendant from further damaging Plaintiffs as a result of the operation of the Neversink Dam and Neversink Reservoir;

c.    That this Court grant to the Plaintiffs and the other members of the class and for such other, further, different or appropriate relief as to the Court seems just and proper in the circumstances; and

d.    That this Court award to the Plaintiffs the costs and disbursements of this action, including reasonable fees and disbursement to Plaintiffs' counsel and to Plaintiffs' engineering and other experts.

Dated: Florida, New York
      December 15, 2005

                SPIEGEL & JONES, LLP

                By: _____
                      Phaedra Britt, Esq.

                Attorneys for Plaintiffs
                148 North Main Street
                Florida, New York 10921
                (845) 651-2000

- 21 -

| Name | Damaged Property Address |
|------|--------------------------|
| Ballard, James A, Jr. | 14 Maryann Avenue, Port Jervis NY 12771 |
| Bantin, Werner / Ingrid | 31 Community Road, Woodbourne NY 12788 |
| Boyle, Charles/Dorothy | 39 Shore Drive, Meyers Grove, Godeffroy NY 12729 |
| Brancato, Joseph/Linda | 78 Edwards Rd, Monticello NY 12701 |
| Britton, Helen | 16 Mary Ann Avenue, Port Jervis, NY 12771 |
| Capirichio, Joseph | Neversink Campgrounds |
| Carey, Patrick F. | 49 Shore Drive, Godeffroy NY 12729 |
| Casazza, Gesmonda | 32 Hobson Road, Port Jervis NY 12771 |
| Case, Robert R. | 8 Rivers Edge Road, Port Jervis NY 12771 |
| Chain, Mary T. | Red 24, Neversink Campgrounds, Woodbourne NY 12788 |
| Conklin, Lawrence | 3 2nd St, Godeffroy NY 12729 |
| Cooper, Clifford/Diane | 23 Shore Drive, Godeffroy NY 12729 |
| Crimando, Salvatore/Laurie | Neversink River Campground, Lot #23, Hasbrouck Rd, Woodbourne NY |
| Cronk, Brad | 30 Edgewater Lane, Port Jervis NY 12771 |
| Csencsits, Jason / Brooke | 26 Riverdale Road, Port Jervis NY 12771 |
| DallaVerde, Nancy | 12 Rivers Edge Rd, Port Jervis NY 12771 |
| Daly, Ann | 18 Avenue E, Godeffroy NY 12729 |
| Delaney, Hugh | 21 Community Road, Woodbourne NY 12788 |
| Delaney, Hugh | Hasbrouck Road, Woodbourne NY 12788 |
| DiMaggio, Vincent / Sheila | Neversink Campground, Woodbourne NY 12788 |
| Dockery, Patrick J. | 52 Hobson Rd, Port Jervis NY 12771 |
| Doles, Marsha | Hasbrouck Road, Woodbourne NY 12788 |
| Dorosz, Peter/Natalka | 144 3rd Street, Cuddebackville NY 12729 |
| Ebner, Elfriede | 40 Edgewater Lane, Port Jervis NY 12771 |
| Edwards, Kenneth J./Lynne | 26 Riverdale Road, Port Jervis NY 12771 |
| Feinberg, Barbara | 184 Edwards Road, Monticello, NY 12701 |
| Farnekes, Raymond/Elizabeth | 180 Edwards Road, Monticello, NY 12701 |
| Flynn, Joseph/Bernice | Neversink River Campground |
| Galligan, Vincent C./Kathleen | 15 Paradise Road, Cuddebackville NY 12729 |
| Garrity, Helen V. | 17 Rivers Edge Road, Port Jervis NY 12771 |
| Grusz, Daniel J. | 13 Mary Ann Ave, Port Jervis NY 12771 |
| Hahn, Robert/Alice | 35 Shore Dr., Cuttebackville, NY 12729 |
| Harper, Lillian | 46 Skinners Lane, Port Jervis NY 12771 |
| Hildebrandt, Charles/Maureen | 34 Riverdale Rd, Port Jervis NY 12771 |
| Hores, George / Jane | 25 Community Road, Woodbourne NY 12788 |
| House, Mark/Pam | 747 Oakland Valley Rd, Cuddebackville, NY 12729 |
| Howell, Lorraine | 11 Second St, Godeffroy, NY 12729 |
| Howell, William   (son) | 11 Second St, Godeffroy NY 12729 |
| Hurtak, Craig W. | 56 Edgewater Lane, Port Jervis NY 12771 |
| Inniella, Karen/Louis | 3 Rivers Edge Rd, Port Jervis NY 12771 |

| Name | Damaged Property Address |
|------|--------------------------|
| Iocco, Dominick/Elaine | 6 Island Drive, Cuddebackville NY 12729 |
| Jones, Robert | 525 Hasbrouck Road, Woodbourne NY 12788 |
| Keener, Bob | 51 Shore Drive, Godeffroy NY 12739 |
| Kleman, Tom/Pat | 23 Brewer Drive, Cuddebackville NY 12729 |
| King, Richard / Stoffel, Darlene | 95 Galley Hill Rd, Cuddebackville NY 12729 |
| Kirk, Douglas A. | Community Road, Woodbourne NY 12788 |
| Kurzrock, Fred A, Jr. | 52 Community Road, Woodbourne NY 12788 |
| Kurzrock, James / Victoria | 44 Community Road, Woodbourne NY 12788 |
| Kurzrock, Joan L. | 40 Community Road, Woodbourn, NY 12788 |
| Kutzler, Theresa | 28 Boulware Bluff, Godeffroy NY 12729 |
| Kuykendall, Ted/Georgina | 33 Rivers Edge Road / Camp on Smith Road |
| Lasch, Steven | 109 3rd Street, Godeffroy NY |
| Lee, Cheryl | Neversink River Campgrounds |
| Leith, Virginia | 56 Hobson Rd, Port Jervis NY 12771 |
| Leith, Virginia | 52 Hobson Rd, Port Jervis NY 12771 |
| Leith, Virginia | 36 Hobson Rd, Port Jervis NY 12771 |
| Lloyd, William T. | 264 Route 209, Port Jervis NY 12771 |
| Lukas, Edward/Louise | 9 Crane Avenue, Deerpark, Port Jervis NY 12771 |
| Marion, William Sr. | 12 Smith Road. Port Jervis NY 12771 |
| Martin, Douglas | 17 Grove Street, Godeffroy NY 12729 |
| May, Robert/Eunice | 16 Rivers Edge Road, Port Jervis NY 12771 |
| McCue, William T/Larisa | Neversink River Campgrounds, 192 Campground Rd, Woodbourne NY 12788 |
| McDermott, Gerard/Marie | 20 Edgewater Lane, Port Jervis NY 12771 |
| McIntyre, John J. | Neversink River Campground, Woodbourne NY 12788 |
| McMillen, Robert C., Jr | 45 Shore Dr, Cuddebackville NY 12729 |
| Mei, Barbara / Elliott, Brendan | 19 Island Drive, Cuddebackville NY 12729 |
| Menyhart, Linda | 47 Edgewater Lane, Port Jervis NY 12771 |
| Meyer, Kurt / Oly | Neversink River Campground, Woodbourne NY 12788 |
| Moran, Dennis J. / Gloria | 22 Avenue E, Godeffroy NY 12729 |
| Moul, Carol/Tim | 46 Edgewater Lane, Port Jervis NY 12771 |
| Moyson, Donald/Virginia | Neversink River Campground, 192 Campground Rd., Woodbourne, NY 12788 |
| Mulvey, John | 6 Avenue E, Godeffroy NY 12729 |
| Myron, Myron | 159 Third St, Cuddebackville NY 12729 |
| Newell, Lester R. | Edwards Road, Monticello NY 12701 |
| Neversink River Campground, Inc. c/o Dolgas, Julia, Secretary | 192 Campground Road, Woodbourne NY 12788 |
| Norton, Dave/Jane | 23 Rivers Edge Rd, Port Jervis NY 12771 |
| O'Leary, Michael/Christine | 121 Riverdale Rd, Port Jervis NY 12771 |
| O'Leary, Richard A./Kristine | 35 Mountain View Drive, Port Jervis NY 12771 |

1200THREERECORD

| Name | Damaged Property Address |
|------|--------------------------|
| O'Leary, Richard A. (son) | 23 Shore Drive, Godeffroy |
| O'Leary, Richard P./Joan G. | 101 Riverdale Road, Port Jervis NY 12771 |
| O'Leary, Richard P./Joan G. | 39 Mountain View Drive, Port Jervis NY 12771 AND 101 Riverdale Rd, Port Jervis |
| O'Leary, Richard P./Joan G. | 34 Mountain View Drive, Port Jervis NY 12771 |
| O'Leary, Richard P./Joan G. | 30 Mountain View Drive, Port Jervis NY 12771 |
| O'Leary, Richard P./Joan G. | 7 Shore Drive, Godeffroy, NY 12729 |
| O'Leary, Richard P./Joan G. | 111 Riverdale Road, Port Jervis NY 12771 |
| O'Leary, Richard P./Joan G. | 26 Riverdale Road, Port Jervis NY 12771 |
| O'Leary, Richard P./Joan G. | 117 Riverdale Road, Port Jervis NY 12771 |
| O'Leary, Richard P./Joan G. | 34 Riverdale Road, Port Jervis NY 12771 |
| O'Leary, Richard P./Joan G. | 11 Shore Drive, Godeffroy, NY |
| O'Leary, Richard P./Joan G. | 101 Riverdale Road, Port Jervis NY 12771 |
| O'Leary, Richard P./Joan G. | 101 Riverdale Road, Port Jervis NY 12771 |
| O'Leary, Tim | 20 Riverdale Road, Port Jervis NY 12771 |
| Ostrom, Robert | 11 Rivers Edge Rd, Port Jervis 12771 |
| Pallas, Debbie | 10 Edgewater Lane, Port Jervis NY 12771 |
| Robb, John H. / Brighton Alberta | 49 5th Street, Meyers Grove, Godeffroy NY 12729 |
| Roussos, Anthony/Christine | 102 Galley Hill Road, Cuddebackville NY |
| Ruef, Michael | 178 Campground Road, Woodbourne, NY 12788 |
| Russo, Salvatore C. | 1 Grove Street, Godeffroy NY 12729 |
| Schaefer, Christopher/Marcia | 30 Mountain View Drive, Port Jervis NY 12771 |
| Schoomaker, Kevin L. | 130 Third Street, Cuddebackville NY 12729 |
| Siwarski, Edwin | 21 Edgewater Lane, Port Jervis NY 12771 |
| Silker, Peter | 14 Butler Lane, Port Jervis NY 12771 |
| Sperber, Marilyn J. | 96 Edwards Road, Monticello NY 12701 |
| Steward, Monica/Kevin | 25 Rivers Edge Rd, Port Jervis NY 12771 |
| Storms, Douglas / Tricia | 7 Community Road, Woodbourne NY 12788 |
| Tainsky, Gerllyn | 130 Third Street, Cuddebackville NY 12729 |
| Talmadge, Roland/Veronica | 14 Grove St, Godeffroy 12729 |
| Tolleson, Derek/Nancy | 29 Rivers Edge Rd, Port Jervis NY 12771 |
| Valentia, Michael T. | 52 Skinners Lane, Port Jervis NY 12771 |
| Vandemark, Jerome/Louise | 6 Avenue L, Godeffroy NY 12729 |
| Van Derveer, Brian | 19 First Street, Cuddebackville, NY 12729 |
| Van Strander, Terrance/Agnes | 59 Edgewater Lane, Port Jervis NY 12771 |
| Verni, William | 22 Blue, Neversink Campground, 1253 Hasbrouck Rd, Woodbourne NY 12788 |
| Walsh, Debbie | 192 Campground Road, Woodbourne NY 12788 |
| Williams, William J. | 52 Edgewater Lane, Port Jervis NY 12771 |
| Zeller, Robert J. | 395 Neversink Dr, Port Jervis NY 12771 |