UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------------x

BARBARA MEI and BRENDAN ELLIOTT, et al.,

                                Plaintiffs,

               -against-                           06 Civ. 00296 (CM)

THE CITY OF NEW YORK, AND ITS AGENCIES
AND BUREAUS INCLUDING WITHOUT LIMITATION,
THE CITY OF NEW YORK DEPARTMENT OF
ENVIRONMENT PROTECTION,

                                Defendant.

-------------------------------------------------------------------x

## DECISION AND ORDER DENYING DEFENDANT'S
## MOTION TO DISMISS

McMahon, J:

      Plaintiffs are owners and/or residents of property located downstream from the Neversink

Dam ("the Dam") and Neversink Reservoir ("the Reservoir"), which are located on the

Neversink River in Sullivan County, New York.  Plaintiffs, on behalf of themselves and all

others similarly situated, bring this action against the City of New York ("the City"), the owner

and operator of the Dam and Reservoir, claiming that they suffered property damage as a result

of flooding which occurred in April 2005.  Plaintiffs allege both common law and state and

federal statutory causes of action.

      The City moves to dismiss the complaint pursuant to Rules 12(b)(1) and (6), on the

grounds that (1) plaintiffs' interests are represented by the State of New York acting as *parens

patriae*, and thus plaintiffs lack standing to bring the instant suit, (2) plaintiffs' claims are barred

by *res judicata*, (3) the City has no duty to engage in flood control, (4) plaintiffs do not allege

violation of a regulatory mandate, and (5) operation of the Dam is a discretionary exercise for which the City is immune from liability.  Plaintiffs oppose the motion.

For the reasons discussed below, defendant's motion to dismiss is denied.

## BACKGROUND

The relevant facts, as set forth in the complaint and in the May 24, 1954 Report of the Special Master in a lawsuit entitled State of New Jersey v. State of New York and City of New York (Sup. Ct., October Term 1950), are as follows:[1]

*The Neversink Dam and Reservoir*

The Neversink Dam and Reservoir are operated by the City of New York through its Department of Environmental Protection (DEP).  The Dam and Reservoir were constructed between 1941 and 1953; the Dam became operational in 1955.  The Reservoir, which holds approximately 34.9 billion gallons of water, supplies about 10% of the drinking water for New York City.  It receives water from the 93 square mile watershed of the Neversink River. After water enters the Reservoir, it is delivered to the City through a series of aqueducts and tunnels. When the Reservoir fills to capacity, excess water spills into a concrete spillway and down a ravine into the Neversink River, which is a tributary of the Delaware River.  An aqueduct known as the Rondout Aqueduct can be used to divert water from the Reservoir and into the Rondout Reservoir, where water is transferred and stored before being further diverted to New York City.

The Dam that contains the Reservoir is 195 feet high and is located at an elevation of 1,440 feet outside of Liberty, New York in Sullivan County.  It is an earthen dam structure, and

---

[1]The City cited repeatedly to the Report of the Special Master in its motion to dismiss for lack of subject matter jurisdiction – and of course the court is permitted to consider the report on such a motion – but neglected to provide the court with a copy until September 28, 2006.

plaintiffs allege that the normal life expectancy of the dam is fifty years.  Plaintiffs also contend that the City did not perform regular maintenance on the Dam.

Because the City draws much of its drinking water from the Delaware River and its tributaries, four states (New York, New Jersey, Pennsylvania and Delaware) became involved in litigation in the United States Supreme Court.  The litigation eventually resulted in an opinion and decree ("the Decree").  New Jersey v. New York, 347 U.S. 995 (1954).  Pursuant to the Decree, the City of New York was permitted to impound drinking water from the Delaware and its tributaries (including the Neversink), but the imposition of minimum flow requirements protected minimum water flow for downstream states.

According to the complaint, the City's policy regarding the Neversink River and Dam was characterized as a "fill and spill" policy.  The "fill and spill" policy means that, except for certain minimum water releases mandated by the Decree, the City fills the Neversink Reservoir until it spills over into Neversink River.  Plaintiffs allege that this policy was designed to "preserve every last drop of water for the City's reservoir system, except as specifically mandated by the Amended Decree," (Am. Cplt. ¶ 12), without regard to any impact on river flooding, safety of downstream residents and communities and/or river ecology (id. at ¶ 13) or the impact of "fill and spill" on the maintenance and repair of the Dam.  (Id. at ¶ 14.)  The complaint contends that the risk of catastrophic earthen dam failure and collapse is significantly increased as a result of "fill and spill" policies.

*The Floods of 2005*

Plaintiffs allege that, by March 28, 2005, the Neversink Reservoir was already filled and continuously spilling.  They contend that the City knew or should have known that all additional

water entering the Neversink Reservoir, whether from rain or snowmelt, would be spilled from the Reservoir into the Neversink River, unless the City diverted water from the Reservoir. However, the City made no attempt to divert any water.  A rainstorm on March 28-29, 2005 added 2.12 inches of water to the already-full Reservoir, causing the Reservoir to spill continuously during that storm and thereafter, including during a second rainstorm that occurred between April 2 and 4, 2005, when another 3.5 inches of rain fell into the Reservoir.

The snowmelt associated with the spring thaw of March and April 2005 contributed an additional 7.8 billion gallons of water to the Reservoir.

Plaintiffs allege that the City should have known about the Neversink River's potential for flooding and that the "hording" [sic] of water in the Reservoir during that period was unnecessary.  (Am. Cplt. ¶ 28.)   Nonetheless, the City made no attempt to release water from the Reservoir gradually, or otherwise to divert water from the Reservoir, for purposes of water management.  Indeed, the City allegedly even closed pre-existing diversions such as the Rondout Aqueduct for non-emergency repairs during this period.  Plaintiffs contrast this with the City's flood management program at the nearby Pepacton Reservoir, which was reduced to 92.4% of capacity during the same period, as well as with the City's prior policy of diverting water from the Neversink into the Rondout Reservoir early each spring – a diversion that could not occur during the heavy rains of 2005, because the Rondout Aqueduct was out of service.

Between April 2 and 4, plaintiffs allege that the City became concerned about the possibility that the Neversink Dam would collapse under the volume of water generated by its "fill and spill" policy, and so elected to follow an emergency protocol by opening the release valves at the base of the dam.  This released a torrent of water into the Neversink River

4

"comparable to a tsunami or storm surge in a hurricane." (Am. Cplt. ¶ 44.) Plaintiffs allege that the valves had not been maintained and were defective, and so could not be closed to control this water flow. A wall of water moved down the river, causing water levels to rise in excess of the "100 year" flood markers. This wall of water led to the flooding that destroyed or damaged plaintiffs' property. (Id. at ¶ 51.)

*The Claims in Suit*

Plaintiffs assert both statutory and common law claims arising out of the Spring 2005 flooding.

In a single paragraph, plaintiffs allege that the City has committed 18 different non-common law violations, including violations of 42 U.S.C. § 1983; The New York State Environmental Conservation Law; the Dam Safety and Security Act of 2002; The Water Resources and Development Act of 1996; the "Conservation Law" of the United States (including 16 U.S.C. §§ 469 and 1278); OSHA; the New York State Industrial Code; the Federal Clean Water Act; the National Environmental Policy Act; the Navigation and Navigable Waters Act; the National Wild and Scenic Rivers Act of 1968; the Endangered Species Act of 1973; the Public Trust Doctrine; the New York City Administrative Code; the United States Constitution and the Constitution of the State of New York; "numerous" unidentified state and local statutes, ordinances and judicial directives, and the Amended Decree of the United States Supreme Court. (Id. at ¶ 64.) Plaintiffs refer to this omnibus allegation as their "statutory claims," although at least some of them are non-statutory in nature.

The complaint does not specifically allege what action or inaction by the City violated which statute, ordinance or judicial directive. There are few citations to specific sections of

statutes that are allegedly violated.

In addition, plaintiffs plead a common law negligence claim. (Am. Cplt. ¶ 61.)

Plaintiffs seek damages for the diminution or loss of the value of their real property, costs and expenses incurred in connection with their evacuation, relocation, temporary housing and moving; loss of income; loss of quality of life and psychological injuries; and something called "[o]ngoing expenses and damages in connection with the City's policies and procedures associated with the Neversink River and the Neversink Dam...." (Id. at ¶ 55.)

The 141 named plaintiffs have all filed notices of claim with the City, under the State's General Municipal Law. However, they purport to bring this action as a class action. For reasons not yet explained, they invoke Article 9 of New York's Civil Practice Law and Rules; obviously, they should have invoked Rule 23 of the Federal Rules of Civil Procedure. No motion for class certification has yet been made.

## STANDARD OF REVIEW

Federal Rule of Civil Procedure 12(b)(1) provides for the dismissal of a claim when the federal court "lacks jurisdiction over the subject matter." Fed. R. Civ. P. 12(b)(1). In considering a motion to dismiss for lack of subject matter jurisdiction, the court must assume the truth of the complaint's factual allegations. See Shipping Fin. Servs. Corp. v. Drakos, 140 F.3d 129, 131 (2d Cir. 1998). However, when resolving issues surrounding subject matter jurisdiction, a district court is not confined to the complaint and may refer to evidence outside the pleadings, such as affidavits. Makarova v. United States, 201 F.3d 110, 113 (2d Cir. 2000) (internal citations omitted). Plaintiff bears the burden of establishing the court's jurisdiction by a preponderance of the evidence. See Luckett v. Bure, 290 F.3d 493, 496-97 (2d Cir. 2002). The

court should consider a 12(b)(1) motion before ruling on any other motions to dismiss, as dismissal of an action for lack of subject matter jurisdiction will render all defenses and motions moot.  See Rhulen Agency, Inc. v. Alabama Ins. Guar. Ass'n, 896 F.2d 674, 678 (2d Cir. 1990).

Dismissal of a complaint for failure to state a claim pursuant to Rule 12(b)(6) is proper where "it appears beyond a doubt that the plaintiff can prove no set of facts in support of his claim that would entitle him to relief."  Harris v. City of New York, 186 F.3d 243, 247 (2d Cir. 1999).  The test is not whether the plaintiff ultimately is likely to prevail, but whether he is entitled to offer evidence to support his claims.  Chance v. Armstrong, 143 F.3d 698, 701 (2d Cir. 1998).  As a general rule, "[i]n considering a motion to dismiss for failure to state a claim under Fed. R. Civ. P. 12(b)(6), a district court must limit itself to facts stated in the complaint or in documents attached to the complaint as exhibits or incorporated in the complaint by reference."  Kramer v. Time Warner, Inc., 937 F.2d 767, 773 (2d Cir. 1991).  The court assumes that all factual allegations in the complaint are true, and draws all reasonable inferences in the plaintiff's favor.  EEOC v. Staten Island Sav. Bank, 207 F.3d 144, 148 (2d Cir. 2000).

## DISCUSSION

A.    Plaintiffs Have Standing to Bring This Action

Defendant moves to dismiss the complaint for lack of subject matter jurisdiction under Rule 12(b)(1) on the ground that plaintiffs' interests are represented by the State of New York acting as *parens patriae*, and thus plaintiffs do not have standing to bring this action.[2]  Plaintiffs

---

[2]"Although we have noted that standing challenges have sometimes been brought under Rule 12(b)(6), as well as Rule 12(b)(1), the proper procedural route is a motion under Rule 12(b)(1)."  Alliance For Envtl. Renewal, Inc. v. Pyramid Crossgates Co., 436 F.3d 82, 88 n.6 (2d Cir. 2006) (noting "[t]he distinction is important because a typical dismissal under Rule 12(b)(6), i.e., for failure to state a claim, is an adjudication on the merits with preclusive effect....

counter that the State of New York has not exercised its *parens patriae* authority with respect to the interests at issue in this matter.  The State of New York, which is not a party to this action, has not expressly asserted *parens patriae* authority, and has not weighed in on whether such authority exists in this case.  The court finds that it does not.

A state acting as *parens patriae* – or literally "parent of the country" – may bring a suit "for an injury to it in its capacity of quasi-sovereign.  In that capacity the State has an interest independent of and behind the titles of its citizens, in all the earth and air within its domain." Badgley v. City of New York, 606 F.2d 358, 365 (2d Cir. 1970) (quoting Georgia v. Tennessee Copper Co., 206 U.S. 230, 237 (1907)).

The Supreme Court has articulated a three-part test for determining whether a State is properly acting pursuant to its *parens patriae* authority:  First, the State must identify a sovereign or quasi-sovereign interest of the public; second, that interest must touch upon a "substantial segment of the State's population"; and third, the State must "articulate an interest apart from the interest of particular private parties, i.e., the State must be more than a nominal party."  See Alfred L. Snapp & Sons v. Puerto Rico, ex rel., Barez, 458 U.S. 592, 607 (1982).

In a case virtually identical to the case at bar, Judge McAvoy of the Northern District of New York recently ruled against the City of New York's claims that the *parens patriae* doctrine and *res judicata* barred plaintiffs whose property was damaged in floods from maintaining suit against the City.  Allen v. City of New York, No. 3:05-CV-1559, 2006 WL 2052229, slip op. (N.D.N.Y. Jul. 21, 2006).

---

Presenting and considering a challenge to lack of Article III standing under Rule 12(b)(1) avoids the need to fashion a modified approach to a Rule 12(b)(6) motion that concerns standing.") (internal citations omitted).

In <u>Allen</u>, plaintiffs alleged that the City mismanaged another Delaware River watershed dam, the Pepacton Dam, by not reducing the water level prior to the arrival of the heavy rains generated by Hurricane Ivan.  The resulting flooding allegedly damaged plaintiffs' property. The Pepacton Dam, like the Neversink Dam, is located on a tributary of the Delaware River, was put into service in 1955, and is subject to the mandates of the 1931 Supreme Court decision and the 1954 Decree.  New York City made the same arguments concerning plaintiffs' standing and former adjudication in <u>Allen</u> that it makes in this case.

The <u>Allen</u> court rejected the contention that the State of New York, acting *parens patriae* before the Supreme Court on behalf of all the State's citizens in the Delaware River interstate litigation, was acting with respect to protecting property owners from flood damage. Judge McAvoy concluded that New York had indeed acted in *parens patriae*, but only to protect the water rights of its citizens (and specifically the citizens of the City of New York, whose draw on the water was at issue).  The <u>Allen</u> court reviewed the Report of the Special Master that was generated out of the 1952-54 litigation and that resulted in the Amended Decree.  This court has also read that Report.  The issue before the Special Master was whether New York City would be permitted to draw additional quantities of water from the Delaware Watershed – a request that was opposed by the other three states.  The Special Master was called on to determine whether there would be enough water and what the consequences to river ecology, power production and recreation would be if the City's request were granted, and to make a recommendation to the Supreme Court on whether to grant or deny the City's request.  The issue of flood control along the tributaries of the Delaware downstream of the dams and the impact of City water management policies is not discussed in the Special Master's Report, because the issue was

never raised in the interstate litigation.

Additionally, as Judge McAvoy noted, the Pepacton Dam had not been built when the interstate lawsuit was commenced in the 1930s, and did not come into service until 1955, after the entry of the Amended Decree.  There was, therefore, no water control policy in place that would impact the property owners downstream from the Pepacton Dam.  Assuming the facts of the complaint to be true, the same is true of the Neversink Dam – it did not come into service until 1955, after the entry of the Amended Decree.  Neither any property owner nor New York acting in *parens patriae* could have raised an issue about the City's water management policies during floods until the Dam went into service and the City devised such policies.

The City cites to the Report of the Special Master in its brief (specifically to pages 96-100) for the proposition that "flood control" was litigated in <u>State of New Jersey v. State of New York</u>.  That is an utter canard.  On page 98, there is a discussion of New York City's claim that its proposed reservoirs would capture only flood waters, so additional draws would not adversely impact the downstream states.  The entire discussion concerns the need for downstream takers of water from the Delaware and its tributaries to build larger (and more expensive) water storage facilities, in view of (1) New York's proposed additional upstream taking and (2) the need for Philadelphia and Southeastern Pennsylvania to use New York's releases for their water supply.  (<u>See</u> Report of Special Master at 98-99.)  There is nothing – not a single mention – of the impact of flood control policies on the people who live along the Delaware and its tributaries, including the Neversink River.  Indeed, the discussion to which the City cites this court comes under the heading: "The Effect of the Proposed Plan of New York:  The Contentions of Pennsylvania."  (<u>Id</u>., Table of Contents, at iv).  I do not understand the City to argue that the sovereign State of

10

Pennsylvania was representing the interests of the residents of Orange and Sullivan Counties
against the water claims of New York City.

Judge McAvoy distinguished the cases on which the City here relies for the proposition
that the present action is an impermissible collateral attack on the Decree and the Compact.  In
Badgley v. City of New York, plaintiffs, who owned land along the Delaware, complained that
the City's diversion of water from the river (which was being done by order of the United States
Supreme Court pursuant to the Amended Decree) interfered with their "right" to the "full natural
flow of the Delaware River."  606 F.2d 358, 365 (2d Cir. 1979).  Obviously, the plaintiffs had no
right to the full natural flow of the Delaware River, because the Supreme Court had already
decided, in the Delaware Watershed litigation, that the City of New York had the right to divert
some of that "full natural flow" for its own use.  The Badgley plaintiffs' claim was nothing but
an attack on the Decree that New York State had entered into on behalf of all its citizens.  The
Second Circuit ruled that the plaintiffs had no standing to seek the damages for which they sued.

Judge McAvoy also distinguished the City of Philadelphia's unsuccessful effort to
intervene in the interstate litigation in the Supreme Court in order to "protect its water rights."
The Supreme Court declined to permit intervention on the ground that Philadelphia's interests
were being protected by the State of Pennsylvania acting in *parens patriae* for all the residents of
the State.  State of New Jersey v. State of New York, 345 U.S. 369 (1953).  A reading of the
pages of the Special Master's Report to which the City cites confirms the truth of this finding.

Both in Badgley and in State of New Jersey, the issue was how the water of the Delaware
and its tributaries would be divided, and whether the non-riparian City of New York – which is
not located in the Delaware Watershed – would be permitted to divert water from the watershed

11

for its use.  The water management policies of the City of New York concerning water that was taken by it pursuant to the Amended Decree, and whether those water management policies would  inflict damage on the property of riparian owners downstream of the City's dams and reservoirs, were in no way at issue.

Judge McAvoy's reasoning in <u>Allen</u> is sound and applies with equal force to the present case.  Plaintiffs here seek damages for injuries that resulted from flooding allegedly occasioned by years of inferior or nonexistent dam maintenance and misguided water management policies – an issue not raised by the State of New York and not addressed in the Amended Decree.  *Parens patriae* thus does not apply, and plaintiffs have standing to bring their claims before this court.

B.     <u>Plaintiffs' Claims are Not Barred by *Res Judicata*</u>

Defendant argues that plaintiff's claims are barred by the doctrine of *res judicata*, because the subject matter at issue was, or could have been, adjudicated before the Supreme Court in the 1930, 1931, 1953 and/or 1954 actions.  Plaintiffs maintain that they are not in privity with the State of New York, the party that litigated the prior actions, and that issues related to the operation and maintenance of the Neversink Dam have not been – and could not have been – litigated before the Supreme Court.

As discussed above, neither the general issue of flooding, nor the more specific issue of Dam maintenance, was raised in the prior actions.  Nor could these issues have been raised in the prior actions.  Thus, plaintiff's claims are not barred by *res judicata*.

Under to the doctrine of *res judicata*, "[a] final judgment on the merits of an action precludes the parties or their privies from relitigating issues that were or could have been raised in that action."  <u>Monahan v. New York City Dep't of Corrs.</u>, 214 F.3d 275, 284-85 (2d Cir.

12

2000) (citing <u>Allen v. McCurry</u>, 449 U.S. 90, 94 (1980)).  "Whether or not the first judgment

will have preclusive effect depends in part on whether the same transaction or series of

transactions is at issue, whether the same evidence is needed to support both claims, and whether

the facts essential to the second were present in the first."  <u>Id</u>. (quoting <u>NLRB v. United Tech.

Corp.</u>, 706 F.2d 1254, 1260 (2d Cir. 1983)).  The party asserting *res judicata* bears the burden of

proving that (1) the previous action involved an adjudication on the merits; (2) the previous

action involved the plaintiffs or those in privity with them; and (3) the claims asserted in the

subsequent action were, or could have been, raised in the prior action.  <u>Id</u>. (citing <u>McCurry</u>, 449

U.S. at 94).

Defendant emphasizes that, "[a] judgment on the merits in one suit is *res judicata* in

another where the parties and subject matter are the same, not only as respects matters actually

presented to sustain or defeat the right asserted, but also as respects *any other available matter*

*which might have been presented* to that end."  <u>Woods v. Dunlop Tire Corp.</u>, 972 F.2d 36, 38 (2d

Cir. 1992) (quoting <u>Grubb v. Pub. Utils. Comm'n of Ohio</u>, 281 U.S. 470, 479 (1930)) (emphasis

added).  Even if the issues of Dam maintenance and prevention of downstream flooding were not

litigated in the related Supreme Court cases, defendant asserts that they could have been raised,

and thus that plaintiffs are precluded from raising them at this time.

As plaintiffs correctly note, however, "[c]laims based on conduct or procedures which

were not contemplated by, or a direct result of, the earlier action would not necessarily be

precluded."  <u>Monahan</u>, 214 F.3d at 290.  Indeed, "[a]s a matter of logic, when the second action

concerns a transaction occurring after the commencement of the prior litigation, claim preclusion

generally does not come into play."  <u>Legnani v. Alitalia Linee Aeree Italiane, S.p.A.</u>, 400 F.3d

13

139, 141 (2d Cir. 2005) (citing Maharaj v. Bankamerica Corp., 128 F.3d 94, 97 (2d Cir. 1997)).

In this case, issues related to flood prevention and, more specifically, operation and maintenance of the Neversink Dam were not raised during the prior litigations. Indeed, as Judge McAvoy noted in Allen (speaking of the Pepacton Dam), "[i]t is difficult to conceive how claims arising out of the flooding of the Dam could have been asserted in the prior litigation where the final Supreme Court case on the issue (which was in 1954) predates the time that the Dam was put into service in 1955." Allen, 2006 WL 2052229, at *3 n.3. The exact same statement can be made about the Neversink Dam, which also did not become fully operational until 1955.[3]

This is precisely the type of case the Second Circuit contemplated in holding, "[c]laims arising subsequent to a prior action need not, and often perhaps could not, have been brought in that prior action.... 'While the [prior] judgment precludes recovery on claims arising prior to its entry, it cannot be given the effect of extinguishing claims which did not even then exist and which could not possibly have been sued upon in the previous case.'" Storey v. Cello Holdings, LLC, 347 F.3d 370, 383 (2d Cir. 2003) (quoting Lawlor v. Nat'l Screen Serv. Corp., 349 U.S. 322, 327-28 (1955)); see also Marvel Characters, Inc. v. Simon, 310 F.3d 280, 287 (2d Cir. 2002).

---

[3]Although there is no evidence in the record regarding when the Neversink Dam became operational, plaintiffs' opposition papers state that the Dam "was completed on or about 1953, over twenty (20) years after the initial case was argued before the Supreme Court." (Pls.' Mem. in Opp. to Mot. to Dismiss, at 10.) Plaintiffs further state that "although construction of the Neversink Dam was completed in 1953, the City 'began sending water the following year, although only in 1955 did it reach its planned capacity.'" (Id.) (citing http://en.wikipedia.org/wiki/Neversink_Reservoir). Defendant's briefs do not address when the Dam became operational. Ultimately, because the City is immune from common law liability regarding its "fill and spill" policy (see infra Section D.) – and plaintiffs' claims regarding years of faulty maintenance of the Dam could not conceivably have been litigated one year after completion of the Dam – the precise date that the Dam became operational is irrelevant.

But even if the claims could have been brought before the interstate litigation concluded in 1954, they were not claims that had to be brought in that lawsuit, because the issue raised – the propriety of New York City's water and dam maintenance policies vis-à-vis downstream landowners – is not necessarily comprehended in the Decree that terminated State of New Jersey v. State of New York.  Again, the issue being litigated in the Supreme Court was which of four states had the right to the use of what water – and how much of the water – in the Delaware River watershed.  That issue could be and was resolved without any need to consider how New York City would manage the water it diverted as a result of the Amended Decree, or whether its management strategies placed property owners downstream of the Neversink Dam at risk of flood damage to their property.  By contrast, the Badgley plaintiffs' claim that a riparian landholder was entitled to the "full natural flow of the Delaware River" could and should have been raised and litigated in the lawsuit that led to the entry of the Amended Decree, because the "rights" of riparian landholders to prevent water diversion were necessarily impacted by the Supreme Court's order authorizing the diversion.

In sum, the particular property interest that plaintiffs here assert is not, was not and could not have been represented by the State of New York, acting in *parens patriae*, in the Delaware River Watershed litigation.

C.    Plaintiffs Have Stated a Common Law Cause of Action in Negligence

Defendant asserts that plaintiffs' common law claims must be dismissed because, under New York law, the City had no duty to engage in flood control.  Plaintiffs contend that the City had a duty not to make flooding worse than it naturally would have been.  On this pre-answer motion, I cannot say that plaintiffs could prove no theory of recovery, so the motion must be

15

denied.[4]

Both parties rely on <u>Iodice v. State of New York</u>, 277 A.D. 647, 102 N.Y.S.2d 742 (4th Dep't 1951).  The City cites <u>Iodice</u> for the proposition that "a dam owner has the right to let nature take its course."  <u>Id</u>. at 649.  In other words, "[t]here is no responsibility or duty on the [dam owner] to make flood conditions better for lower property owners than they would be if the river flowed naturally in low water and high."  <u>Id</u>. at 652.  However, as plaintiffs correctly emphasize, the corollary to this rule is that a dam owner has a duty not to "increase[] the natural flow of the river at flood time."  <u>Id</u>. at 654-55.  A dam owner must not "permit flood waters to go over his dam where the volume of water cast into the channel below the dam . . . exceed[s] the volume coming in above the dam."  <u>Id</u>. at 649-50.  As the <u>Iodice</u> court recognized, a dam owner may be liable where "the flooding of claimants' premises was . . . greater than it would have been if the dam had never been built."  <u>Id</u>. at 654; <u>see also</u> <u>Allen</u>, 2006 WL 2052229, at *6.  The City, in its moving brief, admits that <u>Iodice</u> recognizes such a limited duty.  (<u>See</u> Def.'s Mem. in Supp. of Mot. to Dismiss, at 18.)

In an effort to demonstrate that, even if such a limited duty does exist, plaintiffs are unable to prove that the City breached this duty, the City cites to Department of Environmental Protection ("DEP") records and charts allegedly showing that the amount of water entering the Reservoir was greater than that leaving the Reservoir.  Plaintiffs respond by arguing at length

---

[4] Judge McAvoy, in dictum in <u>Allen</u>, opined that plaintiffs (whose claims all arose under State law, and whose case was remanded *sua sponte* to the New York State Supreme Court) would not prevail on their claims.  However, because he remanded the case to the State courts, Judge McAvoy did not actually rule on the City's Rule 12(b)(6) motion seeking dismissal of the complaint for failure to state a claim.  I agree with Judge McAvoy that plaintiffs have an uphill battle, given the limited duty that New York imposes on dam owners vis-à-vis downstream landholders.

that the DEP documents are both unreliable and inadmissible.  Both parties seem to forget that I am faced with  a motion to dismiss under Rule 12(b)(6).  I cannot and do not consider evidence; the issue is not whether the plaintiffs can prove their claim.  The court's consideration is limited to the allegations in the complaint, which the court must accept as true.[5]

Thus, neither the DEP charts referenced by the City nor plaintiffs' attacks on them is relevant at this stage of the litigation.  In order to survive defendant's motion, plaintiffs need only to plead that a duty exists and that the City breached it.  This plaintiffs have done.  Plaintiffs have identified a duty, albeit limited, owed by the City not to make flooding worse than it would have been in the absence of a dam.  They have alleged that the City, worried about possible defects in the undermaintained dam, breached this duty by releasing a "wall of water" from the Reservoir (by opening the valves during the storm) that was "not characteristic of mere rising waters that occur on a river during a rainstorm."  (Am. Cplt. ¶ 49.)  They have further alleged that the flooding could only have resulted from a release of water from the Reservoir, as the water levels on the River rose to the "100 year" flood markers, while the rainstorm did not even qualify as a "50 year" storm.  (Id. at ¶ 51.)

Accordingly, plaintiffs sufficiently state a common law claim against the City.  Whether they will be able to prove a violation of their limited duty is an issue for another day.

D.    <u>Plaintiffs' Common Law Claim is Not Barred by the Doctrine of Governmental Function Immunity</u>

---

[5]Indeed, plaintiffs appear to be utterly confused about the type of motion they are opposing, as they devote an entire section of their brief to arguing that "the City has failed to meet its burden of proof for entitlement for *summary judgment*."  (Pls.' Mem. in Opp. to Mot. to Dismiss, at 11) (emphasis added.)

Next, the City asserts that operation of the Dam is a discretionary exercise of a

governmental function for which it is immune from liability.

"As a rule, municipalities are immune from tort liability when their employees perform

discretionary acts involving the exercise of reasoned judgment."  Pelaez v. Llewellyn, 2 N.Y.3d

186, 193, 778 N.Y.S.2d 111, 113 (N.Y. 2004).  Such "governmental functions," for which

municipalities enjoy immunity, include the protection and safety of the public pursuant to the

general police powers.  Rill v. City of New York, No. 03-CV-0522, 2004 WL 324869, at *3

(S.D.N.Y. Feb. 20, 2004).  However, "[w]hen the State acts in a proprietary capacity as a

landlord, it is subject to the same principles of tort law as is a private landlord."  Rubino v. City

of New York, 114 A.D.2d 243, 247, 498 N.Y.S.2d 831, 834 (1st Dep't 1986).

As the New York Court of Appeals has recognized, a public entity can act in a dual role,

on the one hand in a proprietary capacity and on the other hand in a governmental capacity.

Thus, when the liability of a government entity is at issue, "[i]t is the specific act or omission out

of which the injury is claimed to have arisen and the capacity in which that act or failure to act

occurred which governs liability."  Miller v. State of New York, 467 N.E.2d 493, 497, 62 N.Y.2d

506, 513 (N.Y. 1984).  Indeed, the court has identified a continuum of responsibility to

individuals and society deriving from a municipality's governmental and proprietary functions:

> This begins with the simplest matters directly concerning a piece
> of property for which the entity acting as landlord has a certain
> duty of care, for example, the repair of steps or the maintenance of
> doors in an apartment building.  The spectrum extends gradually
> out to more complex measures of safety and security of a greater
> area and populace, whereupon the actions increasingly, and at a
> certain point only, involve governmental functions, for example,
> the maintenance of general police and fire protection.
> Consequently, any issue relating to the safety or security of an
> individual claimant must be carefully scrutinized to determine the

point along the continuum that the State's alleged negligent action
falls into, either a proprietary or governmental category.

Id. at 496.

Given this nebulous continuum, the results of 'careful scrutiny' vary from court to court.
For example, in Rill, this court held that governmental immunity did not protect New York City
against a pedestrian's claim that he tripped over a beam protruding from a concrete barrier, even
though the City had placed the beam in such a position as a security measure to prevent potential
terrorist attacks during the World Economic Forum: "Once the City affirmatively assumes a
duty, it must perform that duty in a non-negligent way." 2003 WL 324869, at *3 (citing Nowlin
v. City of New York, 81 N.Y.2d 81, 88 (N.Y. 1993)). In so holding, the court emphasized the
difference between a municipality's decisions involving resource allocation (which fall into the
governmental category) and its implementation of such decisions (which do not). The court
explained that governmental entities are immune from liability for decisions about health, safety
and the allocation of limited resources for the public's benefit, but "[w]here . . . municipal
authorities have already decided how to allocate resources to accomplish some governmental
function, this rationale for immunity disappears. At that point, it remains only for the
municipality to implement its decision." Id. (internal citations omitted).

Similarly, in Nowlin, the New York Court of Appeals held that the City was not shielded
by governmental immunity where the City had assumed responsibility for placing warning signs
on a parkway on which the plaintiff had an accident. The court noted that the City had
"developed and implemented the [warning] sign placement plan" which required a warning sign
be placed well in advance of a dangerous curve, but that the "City employees mistakenly placed
the signs . . . further south" where the warning would be (and, in fact, was) too late to assist

drivers:  "There is no dispute that negligent placement of the signs perpetuated a dangerous

traffic condition, and the jury reasonably found that such condition was a proximate cause of

plaintiff's injury."  Nowlin, 81 N.Y.2d at 86, 88.

However, many New York state courts have held governmental bodies to be immune

under arguably similar circumstances.  For example, in Weiss v. Fote, plaintiffs were injured in a

motor vehicle accident which occurred at a controlled intersection; their theory of liability was

that the traffic lights were negligently designed because the "clearance interval" between signal

changes was too short.  7 N.Y.2d 579, 582-83 (N.Y. 1960).  The Court of Appeals reversed the

jury verdict in plaintiffs' favor, holding that the issue was not appropriate for jury determination

because "a duly authorized public planning body ha[d] entertained and passed on the very same

question of risk."  Id. at 588.  The court explained that the municipal board's decision regarding

the clearance interval had been made after extensive studies of traffic conditions at that

intersection, and it was improper to have a jury revisit the issue unless the board's decision was

shown to be arbitrary or unreasonable, or that due care was not exercised in making the decision.

Id. at 586; see also Affleck v. Buckley, 96 N.Y.2d 553, 556-57 (N.Y. 2001) (applying

governmental immunity to Nassau County's decision not to install traffic lights and noting that a

governmental body "may be liable for a traffic planning decision only when its study is plainly

inadequate or there is no reasonable basis for its [] plan"); Zambrana v. N.Y.C. Tr. Auth., 786

N.Y.S.2d 488, 490 (1st Dep't 2004) (applying governmental immunity to the City Transit

Authority's policy of keeping subway car doors unlocked while train was moving and finding

that this "conscious decision on the part of TA . . . to afford a ready means of escape is a valid

governmental policy choice" grounded in "a reasonable basis in safety and efficiency

considerations").

In this case, plaintiffs enumerate six separate grounds to support their common law claims, contending that the City was negligent in:

> (a) operating, maintaining and/or repairing the Neversink Reservoir, and/or the Neversink Dam . . . (b) failing to utilize other improvements, structures, machinery . . . which would have adequately protected Plaintiffs; (c) failing to employ and/or enact a water management program . . . (d) failing to develop additional sources of potable water for New York City; (e) spilling, collecting, releasing, diverting, altering, and/or discharging water from the Neversink Reservoir into or upon the Neversink River . . . all without regard to such water's and River's volume, velocity and character, including . . . the character of the water's flow, temperatures, quality, stages, channels, directions, silting, erosion, habitat, all of which has and will continue to have environmental, recreational, economic and/or ecological impacts, and all of which was done without regard to the natural flow and character of the Neversink River . . . ; and/or (f) trespass in connection with said spilling, releasing and/or discharging of water....[6]

(Am. Cplt. ¶ 61.)

It would be difficult to hypothesize a set of facts that implicates the 'allocation of resources' more manifestly than the City's adoption of the "fill and spill" policy to satisfy the City's water needs.  This policy, which essentially requires the City to fill the Neversink Reservoir until it spills over into the Neversink River, is precisely the sort of discretionary policymaking that is protected by governmental immunity.  Rill, 2003 WL 324869, at *3 .  Thus, plaintiffs' common law claims that directly challenge the City's "fill and spill" policy – i.e. claims (e) and (f) above – must be dismissed because governmental immunity "preclude[s] plaintiffs from] second-guessing the considered planning decisions of governmental bodies." Jackson v. New York City Tr. Auth., 818 N.Y.S.2d 32, 34 (1st Dep't 2006).

---

[6]It is unclear whether plaintiffs intend (f) to state a separate common law claim for trespass or to articulate a sixth ground for negligence.  For purposes of this motion, I will treat (f) as a separate claim for trespass.

Similarly, plaintiffs' claims that the City failed to develop supplemental policies with regard to the Neversink Reservoir and Dam – i.e. claims (c) and (d) – must also be dismissed. Enacting a water management program and developing additional sources of potable water are clear governmental functions involving the allocation of a natural resource; accordingly, the City is immune from liability allegedly arising from the decision not to pursue these policies.  See Affleck, 96 N.Y.2d at 556-57.

Plaintiffs' remaining negligence claims – i.e. (a) and (b) above – may proceed.  While the City's policies are immune from litigation, acts and omissions undertaken by the City to implement such policies will not generally be shielded by governmental immunity.  Rill, 2003 WL 324869, at *3 .  If, for example, in Affleck the City had decided to install traffic lights but never maintained them, the light bulbs burnt out, and a motor vehicle accident occurred as a result, the City could certainly be held liable for its failure to properly maintain the traffic lights – even though the City would be immune from damages for its decision to install traffic lights. Similarly, if the plaintiffs merely cited the City's "fill and spill" policy as the only basis for their negligence claim, then governmental immunity would bar this claim, since the policy is the City's chosen method for allocating water resources.

But the complaint also alleges that plaintiffs incurred damages because of, inter alia, the City's "failure to regularly remove silt and debris from . . . valves."  (Am. Cplt. ¶ 47.)  Once the City undertook to use the earthen Dam and Reservoir as a source of water for its citizens, the City also assumed the duty to properly maintain both.  And because the City's operation, maintenance and repair of the Dam and Reservoir involve relatively little discretion, the City cannot be immune to plaintiffs' claims that it undertook these tasks negligently.

22

Plaintiffs further allege that they suffered damages as a result of the City's failure to "divert[ water] from the Neversink Reservoir to the Rondout Reservoir" just before the flood. (Am. Cplt. ¶ 34.)  That this need to use existing structures to protect plaintiffs may have arisen as a direct result of the City's "fill and spill" policy does not immunize the City from potential liability.  Having established this policy, the City does not thereby immunize itself from all liability that may flow from the policy's implementation.  Rill, 2003 WL 324869, at *3.  Because the City chose to use an earthen dam and adopt the "fill and spill" method of water distribution to satisfy the City's water needs, the City may be held liable for damages which arise from their allegedly negligent implementation and oversight of these policy decisions.

Accordingly, although the City is immune from any common law liability regarding either its "fill and spill" policy or its decision not to adopt plaintiffs' policy wish-list, the City is not immune for its allegedly negligent operation, maintenance and repair of the Neversink Dam and Reservoir, nor for its alleged failure to use existing structures to protect plaintiffs.

E.     Violation of Regulatory Mandate

The City urges that all claims in the complaint must be dismissed because plaintiffs do not specifically allege that the release of water via the opening of the valves during the torrential rains of April 2005 violated the terms of the Amended Decree and the regulations promulgated by the New York State Department of Environmental Conservation (DEC) concerning the amount of water that New York City can release from the Delaware reservoirs.  Releases that did not violate those regulatory mandates, the City argues, cannot possibly be actionable.

Plaintiffs' common law negligence claim cannot be dismissed pursuant to Rule 12(b)(6) on this ground.  For the reasons set forth above, plaintiffs have adequately pleaded a claim in

23

negligence.  They have alleged a duty recognized at law and a breach thereof.  The City may, when it answers the complaint, allege compliance with regulatory mandates as a defense against this claim.  Whether that defense is either factually or legally sufficient – that is, whether regulatory mandates compelled the City to open the valve in the middle of a torrential rainstorm and release a wall of water downstream (assuming those allegations to be true – and of course, I do so assume at this juncture) – will have to abide discovery and further briefing.

With one exception, plaintiffs' so-called "statutory" claims must be dismissed, but not because of the "regulatory mandate" defense.  Rather, all but one of plaintiffs' "statutory" claims must be dismissed for failure to abide by the minimal pleading requirements of Federal Rule of Civil Procedure 8.

Unlike the plaintiffs in <u>Allen</u>, who appear to have asserted only state law claims, these plaintiffs claim that the City has violated a laundry list of federal laws (and some state laws as well).  That is the basis for their presence in federal court.

However, it is impossible for the court to ascertain whether plaintiffs have standing to assert claims under these laws – or for that matter whether there are private rights of action to assert – because I really have no idea of the nature of plaintiffs' claims under these statutes. Plaintiffs do not identify (except in a few instances) the specific sections of federal (or state) laws that the City has violated, or explain what actions taken or not taken by the City constituted a violation of any particular law.  Nor do plaintiffs identify the specific "judicial directives" relating to the taking of lands and the maintenance of the reservoir system that the City allegedly violated.

Plaintiffs' "statutory claims" section does not meet the minimal requirements of the

"short, plain statement" rule, Fed. R. Civ. P. 8, because it is impossible for anyone to understand what claims are in fact being asserted.  Therefore, the court *sua sponte* dismisses plaintiffs' "statutory claims" section.

I dismiss these claims without prejudice – with one exception.  To the extent that Paragraph 64 alleges that plaintiffs seek to recover damages for City violations of "the Amended Decree of the United States Supreme Court and the judicial directives, decrees, orders and holdings issued in connection therewith," the claim can be dismissed with prejudice at this juncture.  For the reasons set forth by Judge McAvoy in <u>Allen</u>,  plaintiffs – who are not parties to the Amended Decree – have no standing to maintain any claim for violation of the Amended Decree.  That right belongs solely to the State of New York.

The other so-called "statutory" claims are dismissed without prejudice and with leave to replead separate causes of action under each and every statute or regulation that the City allegedly breached.  Plaintiffs should take care to ascertain whether there exists any private right of action under each such statute, and to plead facts sufficient to give them standing to assert such a claim.  Plaintiffs should not expect that claims brought pursuant to, for example, "numerous State and local statutes, ordinances and judicial directives, related to the taking of New York State lands by the City" will withstand a motion to dismiss; in fact, the court will dismiss any such claims *sua sponte*.  And plaintiffs are cautioned that this is the last time they will be permitted to amend their complaint.  They should think carefully about what claims they really want to assert – and whether those claims really arise under Federal law.

## CONCLUSION

This constitutes the decision and order of the court.

25

This constitutes the decision and order of the court.

Dated: October 5, 2006

_____

U.S.D.J.

BY FAX TO ALL COUNSEL