UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

BARBARA MEI ELLIOT et al.,

                                    Plaintiffs,

          -v-

THE CITY OF NEW YORK et al.,

                                    Defendant.

Case No. 06-CV-296 (KMK)

<u>OPINION & ORDER</u>

---

<u>Appearances</u>:

Phaedra Britt, Esq.
Steven J. Spiegel, Esq.
Spiegel & Jones, LLP
Florida, New York
*Counsel for Plaintiffs*

Boris Sorin, Esq.
Sylvor & Richman, LLP
New York, New York
*Counsel for Plaintiffs*

Douglas M. Jones, Esq.
Dupee & Dupee
Goshen, New York
*Counsel for Plaintiffs*

Christopher J. Murdoch, Esq.
Scot C. Gleason, Esq.
Raafat S. Toss, Esq.
Assistant Corporation Counsels
Jeffrey D. Friedlander, Esq.
Corporation Counsel, City of New York
New York, New York
*Counsel for Defendant*

KENNETH M. KARAS, District Judge:

Plaintiffs bring this action against the City of New York and its agencies and bureaus,

including, inter alia, the City of New York Department of Environmental Protection ("DEP")

(collectively, "Defendant" or "City").[1]  Plaintiffs make a number of allegations, all of which

revolve around the City's alleged failure to properly operate and maintain the Neversink

Reservoir and Neversink Dam during March and April 2005.

The fourth claim of Plaintiffs' Second Amended Complaint alleges that the City violated

42 U.S.C. § 1983 ("Section 1983") by depriving Plaintiffs of their substantive liberty and

property interests without due process of law, and by failing to comply with provisions of the

Endangered Species Act ("ESA") and Clean Water Act ("CWA").  Defendant moves to dismiss

this Section 1983 claim under Rule 12(b)(6) of the Federal Rules of Civil Procedure for failure to

state a claim.  In response, Plaintiffs counter-move for a more definite statement of Defendant's

third affirmative defense (immunity under the Water Supply Act) and to dismiss Defendant's

fourth affirmative defense (accord and satisfaction).

For the reasons stated herein, Defendant's Motion to Dismiss the fourth claim of

Plaintiffs' Second Amended Complaint is granted, and Plaintiffs' cross-motion is denied as

moot.

---

[1]Plaintiffs have initiated this action against the City and "its agencies and bureaus,"
including but not limited to the DEP.  (Second Am. Compl. ("SAC") ¶ 1.)  For the purposes of
this Opinion and Order, the Court will use the word "Defendant" in singular form, as the parties
sued by Plaintiffs are all essentially the same entity – the City of New York.

## I. Background

### A. Factual Background

The following facts are alleged in the Second Amended Complaint and are presumed true for purposes of the instant motion.

Plaintiffs own and/or reside on property located in Sullivan County and/or Orange County, New York – areas downstream from the Neversink Reservoir and Neversink Dam. (SAC ¶¶ 2, 6.)  The Neversink Reservoir contains "approximately 34.9 billion gallons of water, is contained by the 195 foot high Neversink Dam, and is located at an elevation of 1,440 feet . . . ." (*Id.* ¶ 52.)  Plaintiffs "use the lower Neversink River and its habitat for recreational, aesthetic and scientific purposes . . . [,]" and "derive recreational, aesthetic and scientific benefits from the existence of the Neversink River through wildlife observation, study, photography, and recreational fishing on and about the lower Neversink River."  (*Id.* ¶ 8.)

The City owns, operates, and maintains the Neversink Reservoir and Dam.  (*Id.* ¶¶ 11-12.)  The Neversink Reservoir supplies water to the Neversink River through releases, spills, and leakage from the Neversink Dam, which in turn determines the Neversink River's flow.  (*Id.* ¶¶ 15, 17.)  The City, through the DEP, is responsible for operating and maintaining the Neversink Reservoir and Neversink Dam "in compliance with the rules or regulations for releases, promulgated by the New York State Department of Environmental Conservation . . . ."  (*Id.* ¶¶ 13-14.)  One of these regulations states that "[w]henever the . . . Neversink [R]eservoir is spilling, the city shall, in order to improve fishery habitat in the river flowing below such [R]eservoir, release water from such reservoir up to a maximum amount which equals the amount of water which would otherwise be spilling from such [R]eservoir, or the capacity of the

valves, whichever is lesser." N.Y. Comp. Codes R. & Regs. tit. 6, § 671.3(b)(2) (2008) ("Section 671.3(b)(2)").

In March and April 2005, Defendant allegedly implemented a Neversink Reservoir and Dam policy entitled "fill and spill," which violated the existing regulation. (SAC ¶ 21.) According to Plaintiffs, this new policy violated Section 671.3(b)(2) because it permitted the City to "'fill[]' the Neversink Reservoir until it 'spills' over into the Neversink River," thus allowing "the Neversink Reservoir to continuously fill without any offsetting water releases, even as the Reservoir [i]s already spilling, and without regard to predicted and anticipated spring rainfalls and known and predicted spring snow melt." (*Id.* ¶¶ 21-22.) By following this "fill and spill" policy, the City aimed to retain all the water in the Neversink River for the Reservoir system, subject only to "certain minimum water releases mandated by an Amended Decree of the Supreme Court of the United States . . . ." (*Id.* ¶¶ 21, 23.) Plaintiffs allege that in implementing this policy, the City "did not consider, address, or account for" the policy's impact upon, among other things: river flooding; river silting and sedimentation; river turbidity; critical habitats of the dwarf mussel and other endangered species; the flora and fauna along the riverbed; the maintenance and repair of the Neversink Reservoir and Dam; the City's water demand; and the safety of downriver residents and communities. (*Id.* ¶ 24.)

Starting around March 16, 2005, the Neversink Reservoir was filled to capacity and was spilling continuously. (*Id.* ¶ 36.) In the weeks that followed, storms and snowmelt added to the problem. On March 28–29, 2005, a rainstorm "contributed approximately 2.12 inches to the already-filled [and spilling] Neversink Reservoir." (*Id.* ¶ 39.) In late-March and early-April, a massive volume of melting snow added "approximately 7.8 billion gallons of water to the

Neversink Reservoir." (*Id.* ¶ 40.) Finally, during a heavy rainstorm from April 2 through April 4, 2005, "approximately 3.5 inches of rain fell into the Neversink Reservoir." (*Id.* ¶ 46.)

While the Neversink Reservoir was continuously spilling, "the [C]ity . . . closed pre-existing diversions like the Neversink Tunnel for non-emergency repairs." (*Id.* ¶ 42.) The Neversink Tunnel, an aqueduct owned by the City, diverts water from the Neversink Reservoir to the Rondout Reservoir. (*Id.* ¶ 32-33.) In the years prior to 2005, the City used the Neversink Tunnel to divert water from the Neversink Reservoir to the Rondout Reservoir during early spring in order to absorb excess rainfall and snowmelt. (*Id.* ¶ 47.) The past use of this means for diverting water typically "left the Neversink Reservoir at approximately 80% of capacity, on average, as opposed to the more than 100% of capacity in April 2005." (*Id.* ¶ 48.) In addition, the City allegedly neglected to implement a "flood management program to release and divert water," despite the City's supposed familiarity with this type of management plan. (*Id.* ¶¶ 42-44.) These actions contributed to the Neversink Reservoir and Dam's continuous spillage in late-March and early-April 2005.

The City finally "became concerned" with the state of the Neversink Dam on or about April 2, 2005. (*Id.* ¶ 56.) An "earthen" dam structure, the Neversink Dam was already beyond its fifty-year life expectancy in 2005, and allegedly had not been regularly maintained or dredged by the City. (*Id.* ¶¶ 25-28, 31.) The City's "fill and spill" policy is said to have exacerbated the risk of failure and collapse of this kind of dam, because "[r]eservoirs filled to capacity place additional stress and pressure on earthen dams, and spillage over the top of earthen dams hastens the decline in the Dam's integrity." (*Id.* ¶ 53.)

As a result of these concerns, on or about April 2, 2005, the City "elected to open release valves located at or near the base of the Neversink Dam" as an "emergency safety protocol" to reduce pressure on the Dam. (*Id.* ¶¶ 56-57.) The opening of the release valves "released a torrent of water, both in volume and velocity, into the Neversink River" that was "comparable to a tsunami or storm surge in a hurricane." (*Id.* ¶ 58.) The "wall of water" created by the release of the valves exceeded the historical "500 year" flood levels in the area, even though the April 2-4 storm did not qualify as even a "50 year" storm. (*Id.* ¶¶ 65, 67.) The valves also released accumulated silt and sediment into the lower Neversink River. (*Id.* ¶ 61.) Once opened, the City could not close the release valves and, instead, further opened the valves "in an attempt to regain control of the mechanisms of the valves." (*Id.* ¶ 59.) The valves failed because of the City's "failure to maintain the[] valves by regular cleaning of the accumulated silt and debris." (*Id.* ¶ 60.) Furthermore, the City failed to notify Plaintiffs prior to its decision to open the valves, giving Plaintiffs no warnings, evacuation notices, or time to implement emergency safety plans. (*Id.* ¶ 66.)

As a result of this flooding, Plaintiffs suffered, *inter alia*, considerable damage to their land, buildings, and possessions, and now feel less secure in the use and enjoyment of their land. (*Id.* ¶ 71.) In addition, the flooding caused drastic harm to the neighboring environment, in particular the Neversink River's flora and fauna. (*Id.*)

B.  Procedural Background

Plaintiffs filed their original Complaint on January 13, 2006, in New York Supreme Court, Sullivan County. The City subsequently removed the case to this Court and then moved to dismiss the case on grounds of subject matter jurisdiction, res judicata, and governmental

immunity.  On October 5, 2006, Judge McMahon, to whom this case had previously been

assigned, denied the City's Motion to Dismiss.[2]  In that same Decision and Order, however,

Judge McMahon dismissed without prejudice all but one of Plaintiffs' federal and statutory

claims for failure to meet the minimal pleading requirements of Rule 8(a) of the Federal Rules of

Civil Procedure.  *See Mei v. City of New York*, No. 06-CV-296, 2006 WL 2997111 (S.D.N.Y.

Oct. 6, 2006).  Judge McMahon then granted Plaintiffs one final opportunity to amend their

Complaint to identify the specific statutes violated by the City, and to identify how and why the

violation of such statutes arose under federal law.  *See id* at *13 ("Plaintiffs should take care to

ascertain whether there exists any private right of action under each such statute, and to plead

facts sufficient to give them standing to assert such a claim. . . . And plaintiffs are cautioned that

this is the last time they will be permitted to amend their complaint.  They should think carefully

about what claims they really want to assert – and whether those claims really arise under

Federal law.").  On April 7, 2007, nearly six months after the previous Decision and Order,

Plaintiffs filed their Second Amended Complaint.[3]  On June 7, 2007, the City filed a Motion to

Dismiss Count Four of the Second Amended Complaint for failure to state a claim pursuant to

Federal Rule 12(b)(6).  In response, Plaintiffs filed a cross-motion to dismiss the third and fourth

---

[2]This case was reassigned to this Court on August 6, 2007.

[3]On January 5, 2007, three months after the original Decision and Order, the Parties met for a pre-trial conference, and the Court ordered Plaintiffs to file their Second Amended Complaint by March 16, 2007.  This date was later extended to permit Plaintiffs to comply with the sixty-day notice requirements of the CWA and ESA.  The Complaint submitted on April 7, 2007 was Plaintiffs' Second Amended Complaint, as they had previously amended the Complaint on July 10, 2006, shortly after briefing on the first motion to dismiss had been completed.

affirmative defenses asserted in Defendant's Answer – immunity under the Water Supply Act and accord and satisfaction, respectively.  The Court held oral argument on May 22, 2008.

## II.  Discussion

### A.  Standard of Review under Rule 12(b)(6)

Defendant seeks dismissal of the Second Amended Complaint under Fed. R. Civ. P. 12(b)(6) on the grounds that it fails to state a claim.  The Supreme Court has held that "[w]hile a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do[.]"  *Bell Atl. Corp. v. Twombly*, 127 S. Ct. 1955, 1964-65 (2007) (citations omitted and second alteration in original).  In *Twombly*, the Supreme Court also abandoned reliance on the oft-quoted refrain from *Conley v. Gibson* that, "a complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief[,]"  355 U.S. 41, 45-46 (1957).  *Id.* at 1964-69.  As the Court explained, a literal application of *Conley*'s "no set of facts" rationale is improper because "a wholly conclusory statement of claim would survive a motion to dismiss whenever the pleadings left open the possibility that a plaintiff might later establish some 'set of [undisclosed] facts' to support recovery."  *Twombly*, 127 S. Ct. at 1968 (internal citations omitted and alteration in original).  Instead, the Court emphasized that "[f]actual allegations must be enough to raise a right to relief above the speculative level[,]" *id.* at 1965 (citation omitted), and "once a claim has been stated adequately, it may be supported by showing any set of facts consistent with the allegations in the complaint[,]" *id.* at 1979 (internal citations

omitted).  Plaintiff must allege "enough facts to state a claim to relief that is plausible on its face."  *Id.* at 1974; *see also Iqbal v. Hasty*, 490 F.3d 143, 157-58 (2d Cir. 2007) ("After careful consideration of the Court's opinion and the conflicting signals from it that we have identified, we believe the Court is not requiring a universal standard of heightened fact pleading, but is instead requiring a flexible 'plausibility standard,' which obliges a pleader to amplify a claim with some factual allegations in those contexts where such amplification is needed to render the claim *plausible*.").  "If Plaintiff 'ha[s] not nudged [its] claims across the line from conceivable to plausible, [its] complaint must be dismissed.'"  *Darby Trading Inc. v. Shell Int'l. Trading & Shipping Co.*, No. 07-CV-400, 2008 WL 852787, at *3 (S.D.N.Y. Mar. 31, 2008) (quoting *Twombly*, 127 S. Ct. at 1974) (alterations in original).

In considering a Rule 12(b)(6) motion, a court must limit itself to facts stated in the complaint, documents attached to the complaint, and documents incorporated into the complaint.  *See Newman & Schwartz v. Asplundh Tree Expert Co.*, 102 F.3d 660, 662 (2d Cir. 1996).  A court must accept as true a plaintiffs' allegations, and draw all inferences in the plaintiffs' favor. *See Mills v. Polar Molecular Corp.*, 12 F.3d 1170, 1174 (2d Cir. 1993); *Blimpie Int'l, Inc. v. Blimpie of the Keys*, 371 F. Supp. 2d 469, 470-71 (S.D.N.Y. 2005).  At this stage, a court is not concerned with weighing the evidence that would be presented at trial.  *See Chosun Int'l, Inc. v. Chrisha Creations, Ltd.*, 413 F.3d 324, 327 (2d Cir. 2005).

B.  Plaintiffs' Section 1983 Claims

Only one of the four claims in Plaintiffs' Second Amended Complaint is before the Court on this Motion.  Plaintiffs' fourth claim alleges that the City, and not any particular individual employed by the City, violated Section 1983.

"Section 1983 provides a remedy against 'any person' who, under color of state law, deprives another of rights protected by the Constitution."  *Collins v. City of Harker Heights, Texas*, 503 U.S.115, 120 (1992).[4]  Municipalities and other local government entities are included among those persons to whom Section 1983 applies.  *See id.* (citing *Monell v. Dep't of Social Servs.,* 436 U.S. 658, 690-91 (1978)).  "At the same time, the [Supreme] Court [has] made it clear that municipalities may not be held liable 'unless action pursuant to official municipal policy of some nature caused a constitutional tort.'"  *Id.* at 120-21 (quoting *Monell*, 436 U.S. at 690-91).  "[A] local government may not be sued under § 1983 for an injury inflicted solely by its employees or agents.  Instead, it is when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury that the government as an entity is responsible under § 1983."  *Monell*, 436 U.S. at 694.  "Thus, [the] first inquiry in any case alleging municipal liability under

---

[4]Section 1983 provides:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress, except that in any action brought against a judicial officer for an act or omission taken in such officer's judicial capacity, injunctive relief shall not be granted unless a declaratory decree was violated or declaratory relief was unavailable. . . ."

42 U.S.C. § 1983 (2006).

§ 1983 is the question whether there is a direct causal link between a municipal policy or custom and the alleged constitutional deprivation." *Canton v. Harris*, 489 U.S. 378, 385 (1989).

The Court reads Plaintiffs' claim to allege four possible bases for liability under Section 1983: violation of Plaintiffs' substantive property interests, violation of Plaintiffs' substantive liberty interests, violation of the ESA, and violation of the CWA.[5] Each of these claims is based on the alleged "fill and spill" policy followed by the City and the events surrounding the March-April 2005 storms and floods. Accordingly, because Plaintiffs allege that an official policy of the City – i.e., the "fill and spill" policy/practice – was "'the moving force of the constitutional violation,'" *Sarus v. Rotundo*, 831 F.2d 397, 400 (2d Cir. 1987) (quoting *Monell*, 436 U.S. at 694), Plaintiffs have satisfied their burden under *Monell* of alleging a link between the alleged violations and a municipal policy.

---

[5]In their Second Amended Complaint, Plaintiffs allege that "[b]y acts and omissions of the THE CITY, its officers, agents, servants and/or employees, with respect to the Neversink Reservoir and Dam . . . , THE CITY has violated, and continues to violate 42 U.S.C. § 1983, in that THE CITY deprived the Plaintiffs without due process of law, pursuant to the Fifth and Fourteenth Amendments to the United States Constitution." (SAC ¶ 101.) Defendant interprets this language to allege a takings claim, and its briefing addresses it as such. (Def.'s Mem. of Law in Supp. of its Mot. to Dismiss Count Four of the SAC ("Def.'s Br.") 4.) Plaintiffs, however, argue in their response that they have "at least three separate grounds" for a Section 1983 claim: a pattern and practice of deliberate indifference to Plaintiffs' property; violation of the ESA and the CWA; and violation of state regulations governing the operation of the Dam. (Mem. of Law by Pls. in Opp'n to Def.'s Mot. to Dismiss. ("Pls.' Br.") 10.) These grounds of liability, argue Plaintiffs, permit Section 1983 claims based on violation of the federal statutes as well as violations of substantive due process. (*Id.* 13-20.) Defendant, in reply, addresses whether violations of the ESA and CWA can form the basis of a Section 1983 claim, but again construes Plaintiffs other claims as takings claims, rather than as substantive due process claims, despite Plaintiffs' response and Plaintiffs' Counsel's unequivocal statements at oral argument. In light of Plaintiffs' response, it is clear Plaintiffs are not making a takings claim (or have abandoned it), and understands Plaintiffs' Section 1983 claim to be based on substantive due process and violations of the ESA and CWA.

<u>1.  Substantive Due Process Violation for Deprivation of Property</u>

The first possible basis for Plaintiffs' Section 1983 claim sounds in substantive due process.[6]  The substantive component of the due process clause protects individuals against "certain government actions regardless of the fairness of the procedures used to implement them . . . ."  *Daniels v. Williams*, 474 U.S. 327, 331 (1986).  "As a general matter, the Court has always been reluctant to expand the concept of substantive due process because guideposts for responsible decisionmaking in this unchartered area are scarce . . . ."  *Collins*, 503 U.S. at 125; *see also Washington v. Glucksberg*, 521 U.S. 702, 720 (1997) ("By extending constitutional protection to an asserted right or liberty interest, we, to a great extent, place the matter outside the arena of public debate and legislative action.  We must therefore 'exercise the utmost care whenever we are asked to break new ground in this field,' lest the liberty protected by the Due Process Clause be subtly transformed into the policy preferences of the Members of this Court." (quoting *Collins*, 503 U.S. at 125));  *Benzman v. Whitman*, 523 F.3d 119, 127 (2d Cir. 2008) ("In considering a novel claim . . . , we must heed the Supreme Court's cautionary words that 'the Court has always been reluctant to expand the concept of substantive due process.'").

To state a substantive due process claim for deprivation of property, "a party must first establish that he had a valid 'property interest' in a benefit that was entitled to constitutional protection."  *Zahra v. Town of Southold*, 48 F.3d 674, 680 (2d Cir. 1995) (quoting *Brady v. Town of Colchester*, 863 F.2d 205, 211-12 (2d Cir. 1988)) (emphasis omitted); *see also West Farms*

_____

[6]The Due Process Clause of the Fourteenth Amendment mandates that no State shall "deprive any person of life, liberty, or property, without due process of law."  U.S. Const. amend. XIV, § 1.

*Assoc. v. State Traffic Comm'n*, 951 F.2d 469, 472 (2d Cir. 1991) ("[A] plaintiff may not successfully claim a deprivation of property without due process absent the identification of a protected property interest."). Second, a plaintiff must demonstrate the defendant's action depriving the plaintiff of that protected interest was "'so outrageously arbitrary as to be a gross abuse of governmental authority.'" *Lisa's Party City, Inc. v. Town of Henrietta*, 185 F.3d 12, 17 (2d Cir. 1999) (quoting *Natale v. Town of Ridgefield*, 170 F.3d 258, 263 (2d Cir. 1999)). "Substantive due process protects [individuals] against government action that is arbitrary, conscience-shocking, or oppressive in a constitutional sense, but not against government action that is 'incorrect' or 'ill-advised.'" *Catanzaro v. Weiden*, 140 F.3d 91, 95 (2d Cir. 1998) (quoting *Kaluczky v. City of White Plains*, 57 F.3d 202, 211 (2d Cir. 1995)).

### a.  Valid Property Interest

The Supreme Court has emphasized that "the hallmark of property . . .  is an individual entitlement grounded in state law, which cannot be removed except for cause." *Logan v. Zimmerman Brush Co.*, 455 U.S. 422, 430 (1982) (internal quotation marks omitted).  Under this standard, "[t]he types of interests protected as 'property' are varied and, as often as not, intangible, relating 'to the whole domain of social and economic fact.'" *Town of Castle Rock v. Gonzales*, 545 U.S. 748, 789 (2005) (quoting *Logan*, 455 U.S. at 430); *see, e.g., Tulsa Prof'l Collection Servs., Inc. v. Pope,* 485 U.S. 478 (1988) (right to bring state law claim against an estate is constitutionally protected property); *Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532 (1985) (government employment); *Barry v. Barchi*, 443 U.S. 55 (1979) (horse trainer's license); *Memphis Light, Gas & Water Div. v. Craft*, 436 U.S. 1 (1978) (utility service); *Mathews v. Eldridge*, 424 U.S. 319 (1976) (disability benefits); *Goss v. Lopez*, 419 U.S. 565 (1975) (high

school education); *Bell v. Burson*, 402 U.S. 535 (1971) (driver's license); *Goldberg v. Kelly*, 397 U.S. 254 (1970) (welfare benefits). Here, Plaintiffs argue that they have a property interest in the City's obligation to follow its own laws – in particular, a specific regulation which requires the City to open the release valves of the Neversink Dam when the Neversink Reservoir overflows.

"For a property interest to be protected by the Due Process Clause, 'a person clearly must have more than an abstract need or desire for it,' or even a 'unilateral expectation of it. He[/she] must, instead, have a legitimate claim of entitlement to it.'" *Seabrook v. City of New York*, 509 F. Supp. 2d 393, 403 (S.D.N.Y. 2007) (quoting *Bd. of Regents v. Roth*, 408 U.S. 564, 577 (1972)). "Such entitlement must be created and defined by sources independent of the Constitution, such as state or local law." *Id.* (citing *Bd. of Regents*, 408 U.S. at 577). In general, "the mere violation of a state law does not automatically give rise to a violation of federal constitutional rights." *Zahra*, 48 F.3d at 682. Whether a plaintiff has a "legitimate claim of entitlement" to a particular benefit focuses "primarily on the degree of discretion enjoyed by the issuing authority, not the estimated probability that the authority will act favorably in a particular case." *RRI Realty Corp. v. Inc. Vill. of Southampton*, 870 F.2d 911, 918 (2d Cir. 1989); *see also Zahra*, 48 F.3d at 680 ("[A]nalysis focuses on the extent to which the deciding authority may exercise discretion in arriving at a decision." (emphasis omitted)). "Where a regulator has discretion with regard to the benefit at issue, there normally is no entitlement to that benefit." *Gagliardi v. Vill. of Pawling*, 18 F.3d 188, 192 (2d Cir. 1994); *see also Villager Pond, Inc.*, 56 F.3d 375, 378 (2d Cir. 1995) ("[C]lear entitlement, and, in turn, a constitutionally protected property interest, exists only when 'the discretion of the issuing agency is so narrowly

circumscribed that approval of a proper application is virtually assured.'" (quoting *RRI Realty Corp.*, 870 F.2d at 918)).

Plaintiffs argue that the law governing the City's obligations regarding the Neversink Dam allows no exercise of discretion. The regulation in question states the following:

> Whenever the . . . Neversink [R]eservoir is spilling, the city *shall*, in order to improve fishery habitat in the river flowing below such [R]eservoir, release water from such [R]eservoir up to a maximum amount which equals the amount of water which would otherwise be spilling from such [R]eservoir, or the capacity of the valves, whichever is lesser.

Section 671.3(b)(2) (emphasis added). According to Plaintiffs, the use of the word "shall" in Section 671.3(b)(2) removes any discretionary power – once the water begins spilling over the top of the Dam, the City must open valves and release the water up to the amount that would otherwise be spilling from the Reservoir. This lack of discretion, argue Plaintiffs, grants an entitlement to the benefits of this regulation.

The Court need not determine, however, whether this regulation gave the City discretion in its operation of the Dam between March and April 2005, as Plaintiffs fail to satisfy the other elements of a protected property interest. First, Plaintiffs fail to demonstrate that they enjoyed an "individual" entitlement in the enforcement of the regulation. Unlike a property interest in a building permit or the like – which involves an entitlement potentially owed to a specific individual – the interest alleged by Plaintiffs is a right to a general governmental service. "[A] generalized obligation to enforce regulations . . . does not create an absolute duty running to individual plaintiffs." *See Seabrook*, 509 F. Supp. 2d at 404 n.9 (citing *Wooters v. Jornlin*, 477 F. Supp. 1140, 1146-1148 (D. Del. 1979)); *see also Assoko v. City of New York*, 539 F. Supp. 2d

728, 738 n.11 (S.D.N.Y. 2008) (same).[7]  Here, Plaintiffs have not alleged an entitlement owed to

---

[7]In both *Seabrook* and *Assoko*, Judge Holwell adopted the careful reasoning of *Wooters v. Jornlin*, a District of Delaware case that discussed how and when a plaintiff might have a property interest in general government service.  The court in *Wooters* noted that the demonstration of a non-discretionary obligation is not enough to establish individual entitlement to a general government service.  Rather,

> [t]he party claiming the right must further show that the duty is owed to him as an individual rather than to the public at large.  Of course, there could be some service which is owed to each and every individual in a political unit and hence could be considered a property interest.  Nevertheless, in order to become property the service must be owed to discrete individuals or individual entities.  The Court is convinced that these principles, although unarticulated, have guided courts in the past.  For example, in *Goss v. Lopez*, 419 U.S. 565, 573 (1975), plaintiffs were found to have a claim of entitlement to the provision of free education, a service, where Ohio law expressly directed local authorities "to provide a free education to all Residents between five and 21 years of age." (Emphasis added).  There, the duty imposed by state law ran directly to the plaintiffs as individual residents.  On the other hand, it has been held that laws providing [t]he general public with police or fire protection do not grant [i]ndividuals a property right in that protection.  *Shortino v. Wheeler*, 531 F.2d 938, 939 (8th Cir. 1976); *Reedy v. Mullins*, 456 F. Supp. 955, 958 (W.D. Va. 1978); *Reiff v. City of Philadelphia*, 471 F. Supp. 1262 (E.D. Pa. 1979).  All of these cases involved claims of entitlement to the provision of governmental services.  Moreover, in all cases the defendants had a duty to provide those services.  They reached opposite results only because in *Goss* the duty was owed to each resident in a certain age class while in *Reiff, Shortino* and *Reedy*, the duty was owed to the undifferentiated General public.  Thus, the Court concludes that in order to establish the existence of a property interest in housing inspections, the plaintiffs must point to (1) an independent source of authority (2) that establishes an absolute duty (3) that is owed to them as individuals rather than as members of the undifferentiated public.

477 F. Supp. at 1144; *see also Gillies v. Utah County*, 765 F. Supp. 692, 694-95 (D. Utah 1991) (applying three-prong test in *Wooters* and holding that plaintiffs did not have an entitlement to the building permit at issue, as the regulation in question applied to the undifferentiated public rather than to plaintiffs as individuals).  The Second Circuit has not adopted or rejected this

them as individuals rather than as members of the undifferentiated public, which leaves them short of claiming a constitutionally-cognizable property interest. *See Seabrook*, 509 F. Supp. 2d at 404 n.9; *Assoco*, 539 F. Supp. 2d at 738 n.11; *see also Wooters*, 477 F. Supp. at 1148 ("Since the Court finds that the County Code creates no duties owed to the plaintiffs as individuals, it holds that the Code creates no Fourteenth Amendment property interests in them.").

Second, not only is the regulation aimed at the undifferentiated public, but it also is outside the Plaintiffs' zone of interest: the regulation's express purpose is to "improve fishery habitat in the river," not to mitigate potential flooding. *See* Section 671.3(b)(2) ("Whenever the . . . Neversink [R]eservoir is spilling, the city shall, *in order to improve fishery habitat* in the river flowing below such [R]eservoir, release water from such [R]eservoir . . . ." (emphasis added)). In this regard, it bears noting that "Section 1983 itself creates no substantive rights; it provides only a procedure for redress for the deprivation of rights established elsewhere." *Thomas v. Roach*, 165 F.3d 137, 142 (2d Cir. 1999) (citing *City of Oklahoma City v. Tuttle*, 471 U.S. 808, 816 (1985)); *see also Boyland v. Wing*, 487 F. Supp. 2d 161, 167 (E.D.N.Y. 2007) ("Section 1983 'is not itself a source of substantive rights,' but merely provides 'a method for vindicating federal rights elsewhere conferred.'" (quoting *Albright v. Oliver*, 510 U.S. 266, 271 (1994) (internal quotation marks omitted))). "[I]n determining whether a federal statute creates a federal right enforceable through a Section 1983 action, three factors should be considered: (1)

---

reasoning for cases involving housing inspections, or for cases dealing with property interests generally. However, in *Zahra,* the Second Circuit discussed *Wooters* in depth and stated that it would "not foreclose the possibility that a test such as that stated in *Wooters* might be the proper analysis in a case involving a claim of an entitlement based on a 'governmental service.'" 481 F.3d at 681 n.4. This Court concurs with Judge Holwell and endorses this test for assessing property entitlements to benefits owed to the general public.

'Congress must have intended that the provision in question benefit the plaintiff;" (2) 'the plaintiff must demonstrate that the right assertedly protected by the statute is not so 'vague and amorphous' that its enforcement would strain judicial competence;' and (3) 'the statute must unambigiously impose a binding obligation on the States.'" *Boyland,* 487 F. Supp. 2d at 167 (quoting *Blessing v. Freestone,* 520 U.S. 329, 340 (1997)). In regard to the first factor, whether the provision in question is intended to benefit the plaintiff ultimately depends on whether the legislature intended to vest the plaintiff with an enforceable federal right. *See Gonzaga Univ. v. Doe,* 536 U.S. 273, 283 (2002) ("[I]t is *rights,* not the broader or vaguer 'benefits' or 'interests,' that may be enforced under the authority of [Section 1983]. . . . [W]e must first determine whether Congress intended to create a federal right." (emphasis in original)).

While Plaintiffs are not, in this part of their claim, seeking enforcement of a federal statute, they do seek vindication of constitutional rights they say are rooted in a state law. But, this does not excuse Plaintiffs from establishing that the underlying state law in this case, Section 671.3(b)(2), was meant to protect their property interests. In fact, as the plain language of the regulation states, it was promulgated to "improve fishery habitat in the river flowing below [the Neversink] [R]eservoir."[8] As such, the regulation does not support Plaintiffs' claim to have a federally protected property interest. *See Gonzaga Univ.,* 536 U.S. at 284-85 ("Once a plaintiff demonstrates that a statute confers an individual right, the right is presumptively enforceable by § 1983. But the initial inquiry – determining whether a statute confers any right at all – is no

---

[8]Plaintiffs seek to get around this language by claiming that the language of the regulation does not preclude the possibility that the regulation also was intended to protect their property interests. While this interpretation is indeed possible, the Court is not prepared to engage in the type of post hoc mind-reading necessary to embrace Plaintiffs' wishful interpretation of the regulation.

different from the initial inquiry in an implied right of action case, the express purpose of which is to determine whether or not a statute confers rights on a particular class of persons." (internal citations and quotation marks omitted)); *Bzdzuich v. U.S. Drug Enforcement Admin.*, 76 F.3d 738, 742 (6th Cir. 1996) (holding that Plaintiff could not establish substantive due process violation because the statute in question was enacted to protect the public from the harmful effects of controlled substances, not to further the employment interests of pharmacists); *see also Club Italia Soccer & Sports Organization, Inc. v. Charter Twp. of Shelby*, 470 F.3d 286, 295 n.1 (6th Cir. 2006) ("Arguably, when addressing a due process claim, the statute or constitutional guarantee in question is the underlying state law that creates the protected property interest."); *31 Foster Children v. Bush*, 329 F.3d 1255, 1270 (11th Cir. 2003) (concluding that a provision intends to benefit the plaintiff if, *inter alia*, the provision "contains 'rights-creating' language that is individually focused" and "addresses the needs of individual persons being satisfied instead of having a systemwide or aggregate focus").

Finally, the Court is perplexed in understanding how the replacement of this regulation with the "fill and spill" method by itself actually harmed Plaintiffs. According to Section 671.3(b)(2), the City is required to release water from the Reservoir "up to a maximum amount which equals the amount of water which would otherwise be spilling from such [R]eservoir" whenever the [R]eservoir is spilling. In other words, the City is required to release – at a maximum – the same amount of water that would have spilled over the top or would have passed through the valves, whichever was lesser. Thus, before the late March/early April rains and snowmelt, the only significant difference between compliance with Section 671.3(b)(2) and compliance with the "fill and spill" method would have related to *how* the water would have

passed over or through the Dam, not the *volume* of water that would have passed over or through the Dam. Accordingly, in terms of the volume of water coming down the river – Plaintiffs' prime concern – Plaintiffs have identified no significant difference between following the fill and spill method and the mandates of Section 671.3(b)(2).

This is a critical flaw in the theory of Plaintiffs' case, as Section 671.3(b)(2) is the only state law Plaintiffs identify as underpinning their property interests, and that regulation has nothing to do with City's failure to react to the storms in late March/early April. Although Plaintiffs do tie their injuries to the alleged actions and inactions of the City – in particular, the City's failure to properly maintain the Neversink Reservioir's underwater valves and failure to divert excess water and snowmelt to the Rondout Reservoir – these allegations do not derive from any rights-creating statute or regulation. In other words, even if it would have been prudent for the City to act in the manner suggested by Plaintiffs, Plaintiffs cannot point to any regulation, including Section 671.3(b)(2), that governed the upkeep of the underwater valves or the City's obligations to drain excess water to the Rondout Reservoir in times of significant rain or snowmelt. Instead, Plaintiffs rely on a general duty of care under which they say the City had to properly operate and maintain the Dam. Such an obligation – akin to a common law duty of care – does not provide anything near a federally-protected entitlement of their property interests. Any duty of care that the City did have on the facts of this case was of the abstract sort that the Second Circuit has consistently rejected as the basis for substantive due process claims. *See Natale*, 170 F.3d at 263 (noting that there is no federally protectable property interest where there is uncertainty regarding the state law, as federal courts are not to be "substituted for state courts as ajudicators of the meaning of zoning and other land use regulations").

b.  Gross Abuse of Governmental Authority

Even if Plaintiffs had established a federally protectable property interest adversely affected by the City, victory would not be assured.  Indeed, the Supreme Court has "made it clear that the due process guarantee does not entail a body of constitutional law imposing liability whenever somebody cloaked with state authority causes harm."  *County of Sacramento v. Lewis*, 523 U.S. 833, 848 (1998).  This flows from the basic principle that the Due Process Clause "was 'intended to secure the individual from the *arbitrary* exercise of the powers of government.'"  *Daniels*, 474 U.S. at 331 (1986) (quoting *Hurdado v. California*, 110 U.S. 516, 527 (1884)) (emphasis added).

The Due Process Clause secures an individual's right to procedural due process as well as substantive due process:

> By requiring the government to follow appropriate procedures when its agents decide to "deprive any person of life, liberty, or property," the Due Process Clause promotes fairness in such decisions.  And by barring certain government actions regardless of the fairness of the procedures used to implement them, it prevents governmental power from being "used for purposes of oppression."

*Id.* (quoting *Murray's Lessee v. Hoboken Land & Improvement Co.*, 59 U.S. (18 How.) 272, 277 (1856)).  In regard to the substantive component of the due process right, the Supreme Court has observed that "[h]istorically, this guarantee . . . has been applied to *deliberate* decisions of government officials to deprive a person of life, liberty, or property."  *Id.* at 331.  It is with this backdrop that the Supreme Court has rejected, repeatedly, "the lowest common denominator of customary tort liability as any mark of sufficiently shocking conduct, and [has] held that the Constitution does not guarantee due care on the part of state officials; liability for negligently

inflicted harm is categorically beneath the threshold of constitutional due process." *County of Sacramento*, 523 U.S. at 848. "It is no reflection on either the breadth of the United States Constitution or the importance of traditional tort law to say that they do not address the same concerns." *Daniels*, 474 U.S. at 333.

Supreme Court authority in this area thus teaches that courts "should operate from a 'presumption that the administration of government programs is based on a rational decisionmaking process that takes account of competing social, political, and economic forces." *Lombardi v. Whitman*, 485 F.3d 73, 84 (2d Cir. 2007) (quoting *Collins*, 503 U.S. at 128). From this presumption, and from the historical interpretation of the substantive component of the due process right, courts avoid engaging in a "host of policy choices that must be made by locally elected representatives." *Collins*, 503 U.S. at 129. Accordingly, the Supreme Court "has always been reluctant to expand the concept of substantive due process because guideposts for responsible decisionmaking in this unchartered area are scarce and open-ended." *Id.* at 125.

To avoid unnecessary entanglement of courts and local officials, the second element of a substantive due process violation requires a plaintiff to demonstrate that the defendant's action depriving the plaintiff of the protected interest was "'so outrageously arbitrary as to be a gross abuse of governmental authority.'" *Lisa's Party City,* 185 F.3d at 17 (quoting *Natale*, 170 F.3d at 263). The Second Circuit has emphasized the difficulties that litigants face in demonstrating the arbitrary conduct necessary to establish a substantive due process violation:

> In order to shock the conscience and trigger a violation of substantive due process, official conduct must be outrageous and egregious under the circumstances; it must be truly "brutal and offensive to human dignity . . . ."

*Lombardi*, 485 F.3d at 81 (quoting *Smith v. Half Hollow Hills Cent. Sch. Dist.*, 298 F.3d 168, 173 (2d Cir. 2002)).  While in "gauging the shock," negligence is categorically insufficient, "'conduct intended to injure in some way unjustifiable by any government interest is the sort of official action most likely to rise to the conscience-shocking level.'"  *Id.* (quoting *County of Sacramento*, 523 U.S. at 849).  While the Supreme Court has recognized, in certain circumstances, that conduct demonstrating "deliberate indifference" can support a substantive due process violation claim, the Court has cautioned that, "[d]eliberate indifference that shocks in one environment may not be so patently egregious in another, and our concern with preserving the constitutional proportions of substantive due process demands an exact analysis of circumstances before any abuse of powers is condemned as conscience[-]shocking."  *County of Sacramento*, 523 U.S. at 850.

Here, the allegations by Plaintiffs do not approach the level of "outrageous" or "arbitrary" conduct necessary to establish a substantive due process claim.  As noted above, the City's decision to pursue the "fill and spill" policy in lieu of the established regulations governing the Neversink Dam had no actual bearing on the level of water flowing down the river, and thus the City's decision to modify its procedures did not substantially (if at all) prejudice the residents downstream from the Reservoir.  And, even if the "fill and spill" policy was, in hindsight imprudent, it cannot be said, and it has not been alleged, that the City adopted the policy as a deliberate decision to deprive downstream residents of their liberty or property.  The other misconduct alleged by Plaintiffs – in particular, the City's failure to lower the level of the [R]eservoir in anticipation of seasonal snowmelt/rainfall and the City's failure to properly operate the underwater valves once opened (because of the failure to properly maintain them) –

is more aptly characterized as potentially negligent or grossly negligent conduct, rather than intentional or reckless conduct designed to deprive others of property or even a gross abuse of governmental authority.  As such, it is precisely the type of substantive due process claim that is routinely rejected   *See, e.g., Daniels*, 474 U.S. at 328 & 330 (1986) ("[T]he Due Process Clause is simply not implicated by a *negligent* act of an official causing unintended loss of or injury to life, liberty, or property . . . . Not only does the word 'deprive' in the Due Process Clause connote more than a negligent act, but we should not open the federal courts to lawsuits where there has been no affirmative abuse of power." (internal quotation marks omitted and emphasis in original)); *Shannon v. Jacobowitz*, 394 F.3d 90, 94 (2d Cir. 2005) ("[T]he Due Process Clause is simply not implicated by a negligent act of an official causing unintended loss of or injury to life, liberty, or property." (citing *Daniels*, 474 U.S. at 328)); *Heredia v. Doe*, 473 F. Supp. 2d 462, 463 (S.D.N.Y. 2007) (same); *New Holland Vill. Condo. v. DeStaso Enters. Ltd.*, 139 F. Supp. 2d 499, 503 (S.D.N.Y. 2001) ("It is well settled that claims sounding in negligence – even gross negligence, or negligence that results in grievous injury – cannot be disguised as constitutional claims and brought in a federal court under 42 U.S.C. § 1983. . . . even if the state's negligence results in the loss of life or property." (citing *DeShaney v. Winnebago County Dep't of Social Servs.*, 489 U.S. 189, 195 (1989)).

Plaintiffs seek to avoid dismissal by insisting that the City's conduct here was more than negligent; that it was grossly negligent if not reckless, and that such allegations are sufficient to state a substantive due process claim.  In support of this broad contention, Plaintiffs rely on the unremarkable proposition that something less than intentional conduct may trigger a substantive due process violation in certain contexts.  (Pls.' Br. 11-12.)  The cases Plaintiffs cite in support

of this proposition involve either the so-called "state created danger" or the "special relationship" circumstances. Neither circumstance, however, describes this case. As the Second Circuit has explained, "'special relationship' liability arises from the relationship between the state and a particular victim, whereas 'state created danger' liability arises from the relationship between the state and the private assailant." *Pena v. Deprisco*, 432 F.3d 98, 109 (2d Cir. 2005). "Special relationship" liability typically involves incarceration or some other form of state-imposed commitment. *See, e.g.*, *Matican v. City of New York*, 524 F.3d 151, 156 (2d Cir. 2008) (noting that involuntary custody is the linchpin of any special relationship exception); *Lombardi*, 485 F.3d at 79 n.3 ("Special relationships arise ordinarily if a government actor has assumed an obligation to protect an individual by restricting the individual's freedom in some manner, as by imprisonment."); *Suffolk Parents of Handicapped Adults v. Wingate*, 101 F.3d 818, 824 (2d Cir. 1996) (holding that plaintiffs' claim did not fall within special relationship exception because "the plaintiffs here . . . are not involuntarily institutionalized"); *Kelsey v. City of New York*, No. 03-CV-5978, 2006 WL 3725543, at *4 (E.D.N.Y. Dec. 18, 2006) (finding that a "special relationship" exists for due process purposes when arrestee is in the custody of police); *see also* L. Owen, *Safari into the Snake Pit: The State-Created Danger Doctrine*, 13 Wm. & Mary Bill Rts. J. 1165, 1172 (2005) ("Under the new, 'custodial' version of special relationships, very few relationships qualified outside of the obvious contexts of incarceration or civil commitment."). "State created danger" liability, on the other hand, often involves conduct by the state that puts a person in danger of harm from a private actor. *See Pena*, 432 F.3d at 108 ("'If the state puts a man in a position of danger from private persons and then fails to protect him, it will not be

heard to say that its role was merely passive; it is as much an active tortfeasor as if it had thrown him into a snake pit.'" (quoting *Bowers v. DeVito*, 686 F.2d 616, 618 (7th Cir. 1982))).

Neither theory of due process liability fits this case, as the City's alleged misconduct did not involve a custodial relationship with Plaintiffs, nor a relationship with a private actor who in turn harmed Plaintiffs. Accordingly, nothing about the facts of this case warrants the relaxed assessment of intentional conduct typical in the "state created danger" or "special relationship" cases.

However, even if gross negligence was sufficient to satisfy the second prong of Plaintiffs' substantive due process claim – that is, even if the City had a recognizable duty to Plaintiffs akin to that owed in the "state created danger" or "special relationship" cases – Plaintiffs still fail to plead a plausible claim that the City's conduct shocked the conscience. As pled by Plaintiffs, the City runs the Neversink Dam to provide water to the residents of New York City. In fact, Plaintiffs' Complaint acknowledges that the City seeks to maximize the amount of water kept in the Dam, presumably to prepare for potential drought conditions. (SAC ¶ 23 ("The sole and exclusive purpose of the 'fill and spill' policy was to preserve every last drop of water for THE CITY's reservoir system, except as specifically mandated by the Amended Decree.").) From these allegations, it is clear that, even taking all of Plaintiffs' allegations about the City's failure to abide by Section 671.3(b)(2) and to properly maintain the Neversink Tunnel and the underwater valves, nothing Plaintiffs have alleged suggests that the City intended to harm Plaintiffs, or even acted arbitrarily or oppressively. The City is charged with providing water to its residents, while maintaining a responsibility to ensure that the Dam is properly operated to avoid harm to those living near the Dam and the river. With the benefit of

hindsight, Plaintiffs allege that by pursuing the former, the City sacrificed the latter. Yet, this alone does not make good Plaintiffs' due process violation, as such conduct does not shock the conscience. "The Due Process Clause 'is not a guarantee against incorrect or ill-advised" [governmental] decisions. *Collins*, 503 U.S. at 129 (quoting *Bishop v. Wood*, 426 U.S. 341, 350 (1976)). Therefore, difficult decisions by City officials about how to maintain a properly functioning dam are ill-suited to second-guessing by "federal judges interpreting the basic charter of Government for the entire country." *Id.; see Benzman v. Whitman*, 523 F.3d 119, 127 (2d Cir. 2008) (noting that conduct is most likely to rise to level of conscience-shocking if "unjustifiable by any government interest" (citing *County of Sacramento*, 523 U.S. at 849)). Thus, even "[a]rbitrary conduct that might violate . . . regulations as a matter of state law is not sufficient to demonstrate conduct so outrageously arbitrary as to constitute a gross abuse of governmental authority that will offend the substantive component of the Due Process Clause." *Natale*, 170 F.3d at 262. Accordingly, Plaintiffs have failed to establish the second element of their due process claim.

## 2. Substantive Due Process Violation for Deprivation of Liberty

Plaintiffs also allege a substantive due process violation of their liberty interests. This claim has two elements: "'(1) identification of the constitutional right at stake, and (2) consideration of whether the state action was arbitrary in a constitutional sense.'" *Bryant v. City of New York*, No. 99-CV-11237, 2003 WL 22861926, at *8 (S.D.N.Y. Dec. 2, 2003) (quoting *Lowrance v. Achtyl*, 20 F.3d 529, 537 (2d Cir. 1994)).

Here, Plaintiffs allege that their liberty interests were violated because the City policy created a dangerous situation, rendering Plaintiffs more vulnerable to the harm of flooding. For

the reasons already discussed, Plaintiffs have failed to allege the sort of outrageous and arbitrary conduct necessary to sustain such an allegation. *Compare Lowrance*, 20 F.3d at 537 (analyzing an alleged violation of plaintiff's liberty interest and noting that substantive due process protects against government action that is "arbitrary, conscience-shocking, or oppressive in a constitutional sense, but not against government action that is incorrect or ill-advised") (internal citations omitted) *with Catanzaro v. Weiden*, 140 F.3d 91, 95 (2d Cir. 1998) (analyzing an alleged violation of a plaintiff's property interest and noting that substantive due process protects against government action that is "arbitrary, conscience-shocking, or oppressive in a constitutional sense, but not against government action that is incorrect or ill-advised") (internal quotation marks omitted). Accordingly, Plaintiffs' Section 1983 claim based on violation of a substantive due process liberty interest fails to state a claim.

### 3. Violations of the CWA and ESA

The third and fourth possible bases for Plaintiffs Section 1983 claim relate to the City's alleged violations of the CWA and ESA.[9] In response, the City argues that neither the CWA nor the ESA may form the basis of a Section 1983 claim.

Section 1983 is available to enforce violations of federal law by agents of the state. *See Maine v. Thiboutot*, 448 U.S. 1, 4 (1980). There are, however, two exceptions to this general rule: Section 1983 is not available to enforce violations of federal law "where Congress has

---

[9] In their Second Amended Complaint, Plaintiffs allege that the City violated Section 1983 by failing to comply with the mandates of the ESA. (SAC ¶ 103.) However, in its response to Defendant's Motion to Dismiss, Plaintiffs claim that the City violated Section 1983 by failing to comply with the mandates of both the ESA and the CWA. Accordingly, the Court will generously construe Plaintiffs' Section 1983 claim to encompass claims based on both the ESA and the CWA.

foreclosed such enforcement of the statute in the enactment itself and where the statute did not create enforceable rights, privileges, or immunities within the meaning of § 1983." *Wright v. Roanoke Redev. & Hous. Auth.*, 479 U.S. 418, 423 (1987) (*citing Pennhurst State Sch. & Hosp. v. Halderman*, 451 U.S. 1 (1981) and *Middlesex County Sewerage Auth. v. Nat'l Sea Clammers Ass'n*, 453 U.S. 1 (1981)).

Here, Plaintiffs allege Section 1983 claims based on the City's violation of provisions of the CWA and the ESA. However, in *Middlesex County Sewerage Authority v. Nat'l Sea Clammers Association*, 453 U.S. 1 (1981), the Supreme Court explicitly addressed whether a plaintiff may proceed with a Section 1983 claim predicated on violations of the CWA. The Court observed that the CWA contains a comprehensive enforcement mechanism consisting of extensive administrative and judicial remedies, as well as citizen-suit provisions, which "authorize private persons to sue for injunctions to enforce [the] statutes." *Id*. at 14. The Court thus concluded "that the existence of . . . express remedies [in the CWA] demonstrates not only that Congress intended to foreclose implied private actions but also that it intended to supplant any remedy that otherwise would be available under § 1983." *Id*. at 21. Accordingly, Plaintiffs may not proceed with their Section 1983 claim based on violation of the CWA.[10]

Although neither the Supreme Court nor the Second Circuit has expressly addressed

---

[10]At oral argument, Plaintiff attempted to distinguish *National Sea Clammers Association* by arguing that its holding was limited to claims against individual government officials, not claims – such as Plaintiffs' – against municipal entities. Contrary to Plaintiffs' representations, however, the claims in *National Sea Clammers Association* were directed against "various governmental entities *and* officials from New York, New Jersey, and the Federal Government." *Nat'l Sea Clammers Ass'n*, 453 U.S. at 4 (emphasis added). Further, in dismissing plaintiffs' claims under the CWA, the Court in *National Sea Clammers Association* made no distinction between whether the defendants were entities or individuals.

whether the remedial framework of the ESA forecloses remedies under Section 1983, the Court

holds that Plaintiffs' Section 1983 claim based on violations of the ESA is similarly barred.

Applying established Supreme Court principles, courts have found congressional intent to

foreclose Section 1983 remedies where the federal statute at issue contains a complex

administrative enforcement scheme and a private right of action. *See, e.g., City of Rancho Palos

Verdes v. Abrams*, 544 U.S. 113, 120-21 (2005) (holding that an individual may not enforce

provisions of the Telecommunications Act limiting local zoning authority through a Section

1983 action, as the statute provided a separate judicial remedy); *Bruneau v. S. Kortright Cent.

Sch. Dist.*, 163 F.3d 749, 756-57 (2d Cir. 1998) (barring plaintiff's Section 1983 claim based on

violation of Title IX of the Education Amendments of 1972); *Uniformed Firefighters Ass'n,

Local 94, IAFF, AFL-CIO v. City of New York*, 676 F.2d 20, 22 (2d Cir. 1982) (barring

plaintiff's Section 1983 claim based on the Comprehensive Employment and Training Act

because its "comprehensive remedial scheme provides an exclusive remedy"). Indeed, courts

have found congressional intent to permit Section 1983 claims where the federal statute's

enforcement mechanism consists only of "federal oversight and administrative review" without

any express or implied private judicial remedy. *See, e.g.*, *Marshall v. Switzer*, 10 F.3d 925, 930-

31 (2d Cir. 1993) (permitting plaintiff's Section 1983 claim based on violation of Title I of the

Rehabilitation Act); *see also City of Rancho Palos Verdes*, 544 U.S. at 121-22 (collecting cases

permitting Section 1983 claims).

The CWA and the ESA contain similar comprehensive administrative remedies and

express private rights of action in the form of citizen suit provisions. *Compare* 33 U.S.C. §§

1319 (2006) *with* 16 U.S.C. § 1540 (2006). Therefore, as is the case with the CWA, the remedial

devices provided for by the ESA are sufficiently comprehensive "to demonstrate congressional intent to preclude the remedy of suits under § 1983." *Nat'l Sea Clammers Ass'n*, 453 U.S. at 20; *see Shields v. Babbitt*, 229 F. Supp. 2d 638, 666 (W.D. Tex. 2000) (concluding that plaintiff was "foreclosed from bringing a suit under 42 U.S.C. § 1983 because of the comprehensive enforcement scheme of the ESA"), *vacated on other grounds*, *Shields v. Norton*, 289 F.3d 832 (5th Cir. 2002); *see also* Shay S. Scott, *Combining Environmental Citizen Suits and Other Private Theories of Recovery*, 8 J. Envt'l L. & Litig. 369, 374-75 (1994) (noting that most major federal environmental protection laws, including the CWA and the ESA, contain almost verbatim citizen suit provisions modeled after the Clean Air Act citizen suit provisions). Accordingly, Plaintiffs' Section 1983 claim based on violation of the CWA or ESA fails to state a claim.

### C. Plaintiffs' Cross-Motions to Dismiss Defendant's Third and Fourth Affirmative Defenses

In their response to Defendant's Motion to Dismiss, Plaintiffs counter-move for a more definite statement of Defendant's third affirmative defense (immunity under the Water Supply Act) and counter-move to dismiss Defendant's fourth affirmative defense (accord and satisfaction).

#### 1. Third Affirmative Defense: Immunity under the Water Supply Act

In its answer to Plaintiffs' Second Amended Complaint, Defendant asserted an affirmative defense grounded in Title K of the Water Supply Act, which, according to Defendant, provides an exclusive statutory remedy for any tort damages suffered by Plaintiffs. Plaintiffs cross-moved for a more definite statement of this affirmative defense. *See* Fed R. Civ. P. 12(e). Although Defendant noted in its reply brief that Rule 7(a) of the Federal Rules of Civil

31

Procedure does not require Defendant to clarify this affirmative defense (barring a court order requiring one), Defendant did, in fact, clarify the affirmative defense in its reply brief, rendering Plaintiffs cross-motion moot. Accordingly, the Plaintiffs' cross-motion for a more definite statement of Defendant's third affirmative defense is denied as moot.

### 2. Fourth Affirmative Defense: Accord and Satisfaction

Plaintiffs move to strike Defendant's fourth affirmative defense based on accord and satisfaction. "The standard that applies to a motion to strike is the 'mirror image' of the standard on a 12(b)(6) motion to dismiss for failure to state a claim." *Cohen v. Elephant Wireless, Inc.*, No. 03-CV-4058, 2004 WL 1872421, at *2 (S.D.N.Y. Aug. 19, 2004). Rule 12(f) of the Federal Rules of Civil Procedure permits a court to strike "from any pleading any insufficient defense or any redundant, immaterial, impertinent, or scandalous matter." Fed. R. Civ. P. 12(f). Motions to strike affirmative defenses under Rule 12(f) for legal insufficiency are generally disfavored and if there are questions of fact or disputed questions of law, the motion should be denied. *See Landry v. Potter*, No. 04-CV-380, 2005 WL 293500, at *1 (D. Conn. Jan. 27, 2005) (citing *Salcer v. Envicon Equities Corp.*, 744 F.2d 935, 939 (2d Cir. 1984)), *vacated on other grounds*, 478 U.S. 1015 (1986)); *see also Smith v. Masterson*, No. 05-CV-2897, 2006 WL 2819591, at *1 (S.D.N.Y. Sept. 29, 2006) ("It is well-established in this Circuit that a motion to strike an affirmative defense under Rule 12(f) . . . for legal insufficiency is not favored." (internal quotation marks and alterations omitted)); *Estee Lauder, Inc. v. Fragrance Counter, Inc.*, 189 F.R.D. 269, 271-72 (S.D.N.Y. 1999) (same). To prevail on a motion to strike an affirmative defense, a plaintiff must establish three criteria: "(1) there is no question of fact which might allow the defense to succeed; (2) there is no question of law which might allow the defense to

succeed; and (3) the plaintiff would be prejudiced by inclusion of the defense." *S.E.C. v. KPMG LLP*, No. 03-CV-671, 2003 WL 21976733, at *2 (S.D.N.Y. Aug. 20, 2003). "Increased time and expense of trial may constitute sufficient prejudice to warrant granting plaintif's Rule 12(f) motion." *Estee Lauder*, 189 F.R.D. at 272. However, "'even when the facts are not disputed[,] . . . a motion to strike for insufficiency was never intended to furnish an opportunity for the determination of disputed and substantial questions of law[,] . . . particularly when there has been no significant discovery.'" *Id.* (quoting *Salcer*, 744 F.2d at 939).

Here, Plaintiffs argue that they "have not received any payment from the City to compensate them for the damages caused by [the City's] negligent operation of the Neversink Dam." (Pls.' Br. 23.) Defendant, to the contrary, argues that some Plaintiffs may have been compensated by the State's Title K compensation scheme – evidence of which may be held by the Plaintiffs in the form of titles, deeds, orders, or other documents – and thus would be barred from seeking damages from the City. (Mem. of Law by the City of New York in Further Supp. of its Mot. to Dismiss 5.) Because there is some doubt as to whether the challenged matter raises an issue of fact, Plaintiffs' motion to strike is denied. *See Orb Factory, Ltd. v. Design Sci. Toys, Ltd.*, No. 96-CV-9469, 1999 WL 191527, at *19 (S.D.N.Y. Apr. 7, 1999) ("Because DST's affirmative defenses may raise issues of fact and law, the motion to strike DST's affirmative defenses is denied."); *Sunshine Cellular v. Vanguard Cellular Sys., Inc.*, 810 F. Supp. 486, 499-500 (S.D.N.Y. 1992) ("If there is any doubt whether the challenged matter may raise an issue of fact or law, the motion to strike should be denied, and the sufficiency of the allegations left for the adjudication on the merits.").

## III. Conclusion

Therefore, for the reasons stated above, Defendant's Motion to Dismiss the fourth claim

of Plaintiffs' Second Amended Complaint is granted, and Plaintiffs' cross-motion is denied. The

Clerk of the Court is respectfully directed to terminate the pending motions. (Dkt. Nos. 19, 20.)

SO ORDERED.

Dated:    September ⊥ , 2008
             White Plains, New York

KENNETH M. KARAS
UNITED STATES DISTRICT JUDGE

Service List by ECF:

Phaedra Britt, Esq.
Steven Jay Spiegel, Esq.
Spiegel & Jones, LLP
148 North Main Street
Florida, NY 10921
Email: pbrittesq@rcn.com
Email: steven@spiegellegal.com
*Counsel for Plaintiffs*

Boris Sorin, Esq.
Sylvor & Richman, LLP
605 Third Avenue
New York, NY 10158
Email: bsorinesq@gmail.com
*Counsel for Plaintiffs*

Douglas M. Jones, Esq.
Dupee & Dupee
30 Matthews Street
P.O. Box 470
Goshen, NY 10924
*Counsel for Plaintiffs*

Christopher J. Murdoch, Esq.
Scot C. Gleason, Esq.
New York City Law Depart.
Office of the Corporation Counsel
100 Church Street
New York, NY 10007
Email: cmurdoch@law.nyc.gov
Email: sgleason@law.nyc.gov
*Counsel for Defendant*