UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------X
BARBARA MEI ELLIOTT, et al,

                              Plaintiffs,               06 CV 296 (RPP)

          - against -

                                        **OPINION AND ORDER**

THE CITY OF NEW YORK,

                              Defendant.
------------------------------------------------------------X

**ROBERT P. PATTERSON, JR., U.S.D.J.**

      Plaintiffs, owners and residents of property located downstream from the

Neversink Dam and Neversink Reservoir, brought this action against Defendant City of

New York, owner of the Neversink Dam and Reservoir, asserting common law

negligence and violations of the Endangered Species Act in conjunction with the flooding

of the Neversink River that occurred on or about April 2-4 2005.   Plaintiffs and the City

of New York cross-move for summary judgment under Federal Rule of Civil Procedure

56.  For the reasons that follow, Plaintiffs' motion is denied and summary judgment is

granted in favor of Defendant.

## BACKGROUND

      I.      <u>The Dam and Reservoir</u>

      Defendant City of New York operates the Neversink Dam ("the Dam") and the

Neversink Reservoir ("the Reservoir") through its Department of Environmental

Protection, Bureau of Water Supply.  (Judge McMahon's October 5, 2006, Opinion and

Order denying Defendant's Motion to Dismiss at 2, <u>Mei v. City of New York</u>, 06 Civ.

296, 2006 WL 2997111 at *11 (S.D.N.Y. October 5, 2006) ("McMahon Op.").)The

Neversink Dam and Reservoir, located in Sullivan County, New York, were constructed between 1941 and 1953. (McMahon Op. at 2.) The Reservoir was designed and built to be a water-supply reservoir, and it supplies about 10% of the drinking water for New York City. (Id.) The Reservoir holds approximately 34.9 billion gallons of water, which it receives from a 93-square-mile watershed. (Id.) After entering the Reservoir, water can leave the Reservoir in several ways: it can be diverted to the Rondout Reservoir through the six-mile Neversink Tunnel ("the Tunnel"), and from there delivered to the City through a series of aqueducts and tunnels; it can be released into the River through the Dam's release works; and it can spill over into a concrete and stone spillway channel, through an inclined tunnel, into a stilling pond, and over a weir into the Neversink River. (Def.'s Statement of Undisputed Material Facts Pursuant to Rule 56.1 ("Def.'s. 56.1 Statement") at ¶ 4.)[1] Plaintiffs assert that it would also be possible for the water in the Reservoir to rise to a level above the spillway at which the water would flow over the top of the Dam.[2] (Pls.' Response to Def's 56.1 Statement at ¶ 4.)

The Neversink River is a tributary of the Delaware River. The Delaware river provides drinking water to New York City, as well as to other states including New Jersey, Delaware, Pennsylvania. (Def.'s 56.1 Statement at ¶ 2.) These states were involved in litigation before the United States Supreme Court in 1954, resulting in the issuance of a Decree permitting the City to take water from the Delaware and its

_____

[1] Unless otherwise noted, the cited portions of the parties' Rule 56.1 Statements of Undisputed Facts are admitted by the opposing party.

[2] Plaintiffs present no evidence that the Neversink Reservoir was close to overflowing the dam during the April 2-5 flooding. Paul Rush, Deputy Commissioner for the Bureau of Water Supply, testified that the dam is designed to safely handle a flood that results in Reservoir water levels 12 feet above the spillway. During the April 2005 flood, the Reservoir crested at 3.66 feet above the spillway. (Supplemental Decl. of Paul V. Rush, ¶¶ 2-6.)

tributaries so long as it releases enough water from its reservoirs to meet minimum flow requirements for the benefit of downstream states.  (Def.'s 56.1 Statement at ¶ 7.)[3]

In 2005, the City undertook certain repairs to replace the by-pass valves for the Tunnel (Pls.' Statement of Undisputed Material Facts Pursuant to Rule 56.1 ("Pls.' 56.1 Statement") at ¶ 11-12.)  The repairs were necessary due to excessive vibration during operation of the dam.  (Pls.' 56.1 Statement at ¶ 6.)  The City's decision to replace the valves was made in about 1996 or 1997.  (Pls.' 56.1 Statement at ¶ 8.) The repairs required that the Tunnel be dewatered. (Pls.' 56.1 Statement at ¶ 1.)  Defendant contracted with Spectraserv, Inc. for the replacement of the turbine by-pass valves in the Neversink Tunnel Outlet Chamber.  (Spiegel Decl., Ex. E.)  The contract contemplated that the work would be completed within a forty-five (45) day period to be chosen by the City between November 1, 2003 and February 28, 2004, with final field testing and placement into operation to occur within 30 days after this 45 day period.  (Pls.' 56.1 Statement at ¶ 11, Spiegel Decl. Ex. E at 01711-3.)  The project was ultimately postponed to the fall of 2004, and work began in the Tunnel in January 2005.  (Pls.' 56.1 Statement ¶ 9, 12.)  The valve replacement was not completed prior to February 28, 2005, and the Neversink Tunnel remained out of operation on April 5, 2005.  (Pls.' 56.1 Statement at ¶¶ 12-13.)  The work was completed on April 7, 2005.  (Expert Report by Emmet M. Owens, Decl. of Scot C. Gleason, Ex. E, at 4.)

II.     The Flood

---

[3] Plaintiffs dispute some details of the Decree that are not relevant to this opinion.

Early spring 2005 featured two rainstorms, on March 28-29 and April 2-3, which, combined with daytime temperatures of 50 degrees Fahrenheit, produced heavy snowmelt and water-surface runoff, resulting in flooding in the Delaware River basin. (Def.'s 56.1 Statement at ¶ 9.)[4]  On April 2-3, 2005, between three and six inches of rain fell in the Delaware Basin.  (Def.'s 56.1 Statement at ¶ 10.)  The National Weather Service reported 4.10 inches of rainfall over 36 hours on April 2-3 in Claryville, New York, a station just upstream from the Neversink Reservoir.  (Id.)  During this rainstorm, the Neversink Reservoir water level rose to 3.66 feet above the spillway, which is more than double the previous record crest of 1.68 feet above the spillway that was reached on April 17, 1993.  (Pls.' 56.1 Statement at ¶¶ 29-30.)  As a result of the flooding of the Neversink River from April 2 through April 4, 2005, Plaintiffs allege that they suffered an array of damages to their property, as well as psychological damages.  (Am. Compl. ¶ 71.)

III.    The Dwarf Wedge Mussel

The dwarf wedge mussel is a federally listed endangered species.  (Pls.' 56.1 Statement at ¶ 35.)  The dwarf wedge mussel is also listed as an endangered species by the New York State Department of Environmental Conservation.  (Pls.' 56.1 Statement at ¶ 36.)  The dwarf wedge mussel was first reported to inhabit the Neversink River in 1990. (Spiegel Decl., Ex. L at 5.)  The Neversink River population of dwarf wedge mussels was estimated at slightly greater than 10,000 specimens in 1994, which represented a robust population.  (Id.)  Surveys of the population conducted in 2006, 2007 and 2009 indicate

---

[4] Plaintiffs' Response to Defendant's Rule 56.1 Statement contends that the majority of the runoff was caused by rain, rather than snowmelt.  Plaintiffs cite no factual support for their contention. (Pls.' Response at ¶ 10.)

that the abundance of dwarf wedge mussels has declined substantially since the mid-1990s.  (Id.)

The dwarf wedge mussel's preferred habitat is in fine sediment that accumulates between cobbles and it is particularly sensitive to channel size and depth, water quality and velocity of river flows.  (Pls.' 56.1 Statement at ¶ 39.)  The parties agree that the dwarf wedge mussel suffered considerable mortality, including material alteration of its habitat, as a result of the April 2005 flood.  (Pls.' 56.1 Statement at ¶ 41, Def.'s 56.1 Response at ¶ 41.)

IV.     Procedural History

Plaintiffs commenced their action in New York State Court, and the City removed it to this Court on federal question grounds.  In April 2006, the City moved to dismiss the complaint, and Judge Colleen McMahon dismissed a number of statutory and regulatory claims without prejudice, but allowed Plaintiffs' negligence claims to proceed.  On April 24, 2007, Plaintiffs filed the Amended Complaint alleging negligence under New York state law, violations of the Endangered Species Act, violations of the Clean Water Act, and a due process claim under 42 U.S.C. § 1983.  On June 7, 2007, Defendant filed a motion to dismiss the fourth count of the Amended Complaint, the § 1983 claim. Defendant's motion was granted on September 8, 2008.  Fact discovery on liability, including expert discovery, ended on June 18, 2010.  Plaintiffs and Defendant cross-moved for summary judgment of the remaining claims on July 23, 2010.  The parties filed opposition papers on August 20, 2010.  In Plaintiffs' opposition brief, they conceded their claim under the Clean Water Act, leaving only the negligence claims and Endangered Species Act claim for adjudication.  (Pls.' Mem. in Opp. at 2.)  The parties

filed reply briefs on September 3, 2010, and oral argument on the motions was held on October 1, 2010.

## DISCUSSION

I.     Summary Judgment Standard

Summary judgment is appropriate if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c).  It is the initial burden of a movant on summary judgment to come forward with evidence on each material element of his claim or defense, demonstrating that he or she is entitled to relief.  When the moving party has met this initial burden, the opposing party must set forth specific facts showing that there is a genuine issue for trial, and cannot rest on "mere allegations or denials" of the facts asserted by the movant.  Fed. R. Civ. P. 56(e).  The Court must "view the evidence in the light most favorable to the non-moving party, and may grant summary judgment only when no reasonable trier of fact could find in favor of the non-moving party."  Allen v. Coughlin, 64 F.3d 77, 79 (2d Cir. 1995).

Plaintiffs move for summary judgment on the grounds that, pursuant to their interpretation of the evidence, there is no triable issue of fact as to the City's negligence in failing to adhere to its own construction specifications and time tables in relation to its repair of the Neversink Tunnel.  Plaintiffs allege that the City's negligent operation of the Dam and Reservoir caused the harms they suffered as a result of the April 2005 flooding. Plaintiffs also assert that liability in negligence has been established on behalf of Defendant for changing the flow pattern of the Neversink River and Reservoir, and for

6

violating the New York State Department of Environmental Conservation's regulations as well as the Supreme Court Decree governing the usage of water from the Delaware River watershed.  Plaintiffs further contend that they have established Defendant's liability under the Endangered Species Act.

Defendant New York City moves for summary judgment on the grounds that it is not liable to Plaintiff for negligence in the construction or operation of its Dam and Reservoir, because, under governing New York law, the sole duty owed by the City to Plaintiffs was to not make the flood damage any worse than it would have been had the dam not been built, and Defendant fulfilled that duty.  Defendant denies that Plaintiffs have shown that the City is liable to Plaintiffs for negligence.  They also assert that the Plaintiffs' Endangered Species Act claim is meritless because Plaintiffs do not have standing and do not demonstrate that any action of Defendant caused harm to the dwarf wedge mussel.

II.     Negligence Claims

Under New York law, in order to hold a defendant liable for negligence, the plaintiff must establish that the defendant owed them a duty, breached that duty, and that their breach was the proximate cause of the plaintiff's injuries.  Lapidus v. State, 57 A.D.3d 83, 92, 866 N.Y.S.2d 711 (2008).  In the absence of a duty, there is no breach, and without a breach, there is no liability.  Pulka v. Edelman, 40 N.Y.2d 781, 782, 390 N.Y.S.2d 393 (1976).

a.   The City's Duty to Plaintiffs

Under established New York precedent, there is no responsibility by or duty on a dam owner "to make flood conditions better for lower property owners than they would be if the river flowed naturally."   Iodice v. State, 277 A.D. 647, 652-653, 102 N.Y.S.2d 742 (4th Dep't 1951) (unanimously aff'd without opinion, 103 N.E.2d 348, 303 N.Y. 740 (N.Y. 1951)).  "[A] dam owner has the right to let nature take its course, i.e., the right to permit flood waters to go over his dam where the volume of water cast into the channel below the dam does not exceed the volume coming in above the dam."  Id. at 649-650.

Fifty years later, this rule was reaffirmed in 2008 by the Appellate Division, Third Department, in a case brought by plaintiffs who lived downstream from a dam and reservoir and claimed that the dam's owner, New York City, was responsible for flood damage to their properties.  Allen v. City of New York, 49 A.D.3d 1126, 855 N.Y.S.2d 279 (3d Dep't 2008).  In Allen, the court ruled that, because the dam and reservoir in question were built to establish a drinking supply for the City, and not for flood control purposes, under Iodice the City did not owe the plaintiffs a duty other than to avoid making the flood worse than it would have been naturally.  Id. at 1127-1128.  The Allen court dismissed the plaintiffs' complaint, because the defendant submitted documentary evidence establishing that during the storm that led to the flooding, "the amount of water flowing into the reservoir actually exceeded the amount flowing out, that the storm water was released over a longer period of time than it otherwise would have been without a dam, and that, therefore, the dam had an ameliorative impact, not an aggravating one." Id. at 1128.  In a 2010 case, Stormes v. United Water New York, 74 A.D.3d 784, 901 N.Y.S.2d 707 (2d Dep't 2010), the Appellate Division, Second Department also applied the Iodice rule, ruling that the water-supply dam owners had "the right to permit flood

waters to go over the dams/reservoirs, so long as the volume of water cast into the channel below did not exceed the volume coming in above the dams/reservoirs."  Id. at 785-786.

The Neversink Dam and Reservoir were created to establish a drinking supply for New York City, not for the purpose of flood control.  (Def.'s 56.1 Statement ¶ 1; Pls.' Response to Def.'s 56.1 Statement ¶ 1.)  Since the Dam and Reservoir were not created for flood control, the Iodice rule governs; the only duty imposed on Defendant is to avoid making the flooding worse than it would be under natural conditions.

Defendant has established that the flooding of Plaintiffs' property was ameliorated, not exacerbated, by the Dam, and therefore Defendant is entitled to summary judgment.  Defendant's expert Emmet M. Owens, using U.S. Geological Survey ("USGS") records of storm flow measurements taken on the dates of the flood demonstrate that the rate of inflow into the Reservoir exceeded the rate of outflow from the Reservoir into the River, and that the Reservoir attenuated the flood by 20% and reduced the peak flow.  (Report of Emmet M. Owens, Decl. of Scot C. Gleason, Ex. E at 12-13, 18.)  Defendant also relies on the USGS, an agency of the U.S. Department of the Interior, which concluded, in a 2006 report about the April 2005 flood, that although "the Neversink Reservoir was full and spilling at the beginning of the rainfall event on April 2, 2005, [the Reservoir] still attenuated the flood peak."  (*Flood of April 2-3, 2005, Neversink River Basin*, U.S. Geological Survey Open-File Report 2006-1319; Decl. of Scot C. Gleason, Ex. A at 1.) Defendant also relies on The State of New Jersey's Flood Mitigation Task Force which concluded in a similar report that the Reservoir attenuated the peak flow by an estimated 20%, and thereby "attenuate[d] downstream flood flows."

9

(*Report on Delaware River Flood Mitigation*, New Jersey Flood Mitigation Task Force, August 22, 2006; Decl. of Scot C. Gleason, Ex. C at 10.)  Furthermore, as Defendant points out, Plaintiffs' own expert, Roger Ruggles, Ph.D., stated that "the reservoir reduces the peak flow," by releasing water over a longer period of time.  (Report of Roger Ruggles, Aff. of Steven Speigel, Ex. B at 6.)  Mr. Ruggles, at his deposition, stated that he agreed that the Dam "reduced peak outflow from the reservoir…[and] delayed the time at which peak outflow occurred," and that the term "attenuation of a flood" means "the reduction of peak outflow and the delay at which the time of the peak outflow occurs."  (Ruggles Dep. Transcript, 25:22-26, 27:1-9; Decl. of Scot C. Gleason, Ex. G.)  Thus there is no genuine issue of material fact as to whether the Neversink Dam attenuated the effect of the April 2-3 2005 storm.

Plaintiffs argue for a different method of evaluating whether a dam attenuated or exacerbated the rainstorm, namely that the basis for analyzing what is the "natural flow" should not be evaluated by comparison to what the flow would be in the absence of the dam, but rather by comparison to the "new 'natural' flow;" the way the River has flowed under non-storm conditions since the Dam's construction.  (Pls.' Mem. in Opp. at 7.)  Plaintiff cite no legal or scientific authority for adopting this method, and the theory is rejected because its application would appear to impose automatic liability on all owners of water-supply dams for damage caused by storms.  This expansion of liability implicit in Plaintiffs' theory would amount to a rejection of the Iodice holding, which was affirmed by the highest court in New York.  As Defendant points out, the court in Allen and the court in Stormes employed the Iodice inflow versus outflow measure to determine whether the dam attenuated or exacerbated the flood. Allen, 49 A.D.3d at

1127; <u>Stormes</u>, 74 A.D.3d at 786.  ("[D]efendants had the right to…permit flood waters

to go over the dams/reservoirs so long as the volume of water cast into the channel below

did not exceed the volume coming in above the dam's reservoirs.")  The appropriate legal

standard for evaluating whether a dam attenuated a flood, therefore, is whether the

volume of water that flowed into the reservoir during the storm exceeded the volume that

flowed from the dam.  In other words, the imposition of liability on a dam owner is

appropriate where negligent operation of a dam results in water being released at a *faster*

rate than it would be released naturally.  <u>Stockwell v. Town of New Berlin</u>, 69 A.D.3d

1266, 1267, 893 N.Y.S.2d 710 (3d Dep't 2010).  The record in this case demonstrates

that by delaying the peak flow, the Neversink Dam resulted in water being released more

slowly.

Plaintiffs assert another theory of liability based on their expert Mr. Ruggles's

assertion regarding a "wave effect."  As Plaintiffs describe it:

> "[T]he Neversink Reservoir and River presents a fairly unique situation, in
> that water flows downhill at an elevation of approximately one thousand
> vertical feet, with slopes that level out considerably as they approach
> Orange County, New York, where most of the damages occurred and
> where most of the Plaintiffs reside.  [Mr. Ruggles] describes a general
> wave effect, the same effect that produces tsunamis as wave[s] reach land,
> and that produces big splashes in amusement park flume rides as
> precipitous drops level out.  This is the same wave that Plaintiffs
> witnessed, and said magnified their flood damages.  By delaying outflow
> and aggregating water in the reservoir, instead of 'naturally' dispersing the
> outflow, the wave grew larger." (Pls.' Mem. in Opp. at 8.)[5]

Mr. Ruggles cites no scientific authority for his assertion that the higher flow

observed after the rainstorm was caused by the Dam and Reservoir and not by the higher

rainfall.  This assertion therefore fails to comply with Fed. R. Civ. P. 26(a)(2)(B)(ii) or

---

[5] There has been no evidence presented that the "wave effect" attested to by Plaintiffs occurred as
described.

the rules set forth in <u>Daubert v. Dow Chemical</u>, 509 U.S. 579 (1993), and is rejected.

Moreover, it seems clear that the phenomenon Plaintiffs' counsel describes as the "wave

effect" is caused by the topography of the Neversink River, and not by the Dam and

Reservoir.  Mr. Ruggles acknowledged as much at his deposition.  Mr. Ruggles described

a graph he had prepared "allow[ing] an individual to see as slope changes what impact

that slope change has on flow rate."  (Ruggles Deposition; Reply Decl. of Scott C.

Gleason, Ex. A at 57:9-11.)  He then stated that this graph demonstrating the impact of

slope on flow rate would not change if there were no Dam or Reservoir present.  (<u>Id.</u> at

58:11-16.)

  In addition to their primary arguments, Plaintiffs assert that Defendant owed them

"numerous additional duties" under common law.  (Pls.' Mem. in Opp. at 5.) None of the

arguments in favor of imposing additional duties have merit, because the cases cited by

Plaintiffs are either inapplicable to the facts of this case or predate the rule established by

<u>Iodice</u>, which governs the duties of water-supply dam owners.  Plaintiffs first assert that

Defendant owes them duties relating to construction and engineering under <u>Nowlin v.

City of New York</u>, 81 N.Y.2d 81, 595 N.Y.S.2d 927 (N.Y. 1993).  This case deals with

the duties of a city to maintain signage on its roadways, and does not impose duties on

the owners of water-supply dams.  Therefore, it does not impose any additional duties on

Defendant.  Plaintiffs assert that additional duties are imposed on dam owners by the

cases <u>Seifert v. City of Brooklyn</u>, 101 N.Y. 136 (N.Y. 1886), <u>Town of Southeast v. City

of New York</u>, 89 N.Y.S. 630 (2d Dep't 1904), and <u>Clinton v. Meyers</u>, 46 N.Y. 511 (N.Y.

1871).  All of these cases long predate <u>Iodice</u>, and to the extent any rule they apply

differs from the rule of <u>Iodice</u>, they do not state the current governing law.

Plaintiffs also contend in their Memorandum in Support that Defendant's negligence can be demonstrated by its violation of several New York statutes and regulations.  (Pls.' Mem. in Supp. at 16-19.)  First, they assert that the City was negligent in violating 6 NYCRR 671.3(b)(2), which requires that the City release water from the reservoir in order to improve fishery habitat downstream.  This statute specifies that "no action shall be taken by the City until a telephone request has been received," and Plaintiffs offer no evidence that such a telephone request was in fact received by the City.  Furthermore, the statute was written to protect trout fisheries, not the owners of riverfront property, and therefore does not appear to establish a duty owed to Plaintiffs.  Plaintiffs also assert that Defendant violated § 15-0507 of the Environmental Conservation Law ("ECL"), which provides that owners of dams shall operate the structure in a safe condition.  This argument fails because Plaintiffs have not established that Defendant ever operated the Dam in an unsafe condition.  Plaintiffs contend that the City's negligence can established under § 15-2133.1 of the ECL which prohibits reservoirs from rising above the "high flow line," which is defined as the level of the spillway under § 15-2101.11 of the ECL.  The text of this statute explains that it only applies to river regulation reservoirs,[6] and not water-supply reservoirs like Defendant's.  Finally, Plaintiffs assert that Defendant can be held liable for violating § 11-0535.5 of the ECL, which protects endangered species.  As is further discussed in Section III, <u>infra</u>, Plaintiffs cannot demonstrate that Defendant violated this provision because they do not show that the damage to endangered species caused by the flooding would have been in any way

---

[6] Specifically, the statute applies to "any reservoir constructed under the provisions of title 21 of this Article." § 15-2133 of the ECL.  Title 21 refers to "River Regulation by Storage Reservoirs." The Neversink Reservoir is a water-supply reservoir created by the New York State Water Supply Act of 1905, not Title 21, which governs river regulating reservoirs. 1905 N.Y. Laws Ch. 724.

different in the absence of Defendant's Dam and Reservoir.  Finally, Plaintiffs contend

that Defendant is negligent in allegedly violating the United States Supreme Court

Decree governing the release of water from tributaries of the Delaware River. Plaintiffs

have presented no evidence that the City has actually violated any provisions of the

Decree.  Furthermore, the Decree is targeted at ensuring an adequate water supply for the

residents of states that draw water from the Delaware River.  The Decree does not

establish any duty related to flood prevention such that would demonstrate that the City

was negligent in relation to the harm complained of by Plaintiffs.

        b.  <u>Municipal Liability</u>

Lastly, Plaintiffs contend that Defendant can be subject to liability for negligence

because of its decision to repair the Neversink Tunnel in 2004-2005 and failure to re-

open the Tunnel by April 2-5 2005.  (Pls.' Mem. in Supp. at 5-8.) The Neversink Tunnel

is a six-mile tunnel used to divert water from the Neversink Reservoir to the Rondout

Reservoir.  (Def.'s 56.1 Statement at ¶ 4.)  The Tunnel was closed during the April 2005

flooding because Defendant's contractor was still engaged in making repairs to replace

the by-pass valves that were located in the tunnel.  (Pls.' 56.1 Statement at ¶¶ 12-13.)

"As a rule, municipalities are immune from tort liability when their employees

perform discretionary acts involving the exercise of reasoned judgment." <u>Pelaez v.</u>

<u>Llewellyn</u>, 2 N.Y.3d 186, 193, 778 N.Y.S.2d 111 (N.Y. 2004).  "Decisions about

resource allocation, the law recognizes, generally should be left to the discretion of

legislators and other policy-makers, who act in the general public's interest, rather than to

litigants, who act in their own, or to the judiciary." <u>Rill v. City of New York</u>, No. 03-

CV-0522, 2004 WL 324869 at *3 (S.D.N.Y. Feb. 20, 2004.) (citing <u>De Long v. County</u>

of Erie, 60 N.Y.2d 296, 305, 469 N.Y.S.2d 611, 457 N.E.2d 717 (N.Y. 1983)).  In

considering municipal liability, "[i]t is the specific act or omission out of which the injury

is claimed to have arisen and the capacity in which that act or failure to act occurred

which governs liability."  Miller v. State of New York, 467 N.E.2d 493, 497, 62 N.Y.2d

506, 513 (N.Y. 1984).

  The specific act or omission complained of by Plaintiffs is Defendant's choice to

repair the valves in the Neversink Tunnel in 2005, resulting in the Tunnel's closure

during the flooding of the Neversink River.  Plaintiffs contend that the City's electing to

replace these by-pass valves was a "purely proprietary construction act" undertaken by a

land owner, and therefore the City is subject to the same principals of tort law as a private

land owner.  (Pls.' Mem. in Supp. at 5.)  But the City's act was an election to repair an

integral part of its water system.  As explained by Paul Rush, Deputy Commissioner for

the Bureau of Water Supply, the City's decision to repair the Tunnel in the spring was

made to ensure that the City would be able to continue delivering Neversink drinking

water, among the best quality drinking water in the New York water supply system, to its

residents.  (Deposition of Paul Rush, Opp. Decl. of Scott C. Gleason, Ex. B at 153:4-25.)

Thus, this decision was a decision implicating the distribution of resources and a

discretionary government function.  County of Nassau v. South Farmingdale Water Dist.,

62 A.D.2d 380, 390, 405 N.Y.S.2d 742, 747 (2d Dep't 1978) (maintaining a system of

dams and reservoirs to adequately supply drinking water to a city is a government

function).  Therefore, Defendant is immune from claims regarding its choice to replace

the by-pass valves and close the Neversink Tunnel in 2005.[7]

Judge McMahon ruled in her October 5, 2006, opinion that when the City

"undertook to use the earthen Dam and Reservoir as a source of water for its citizens, the

City also assumed the duty to properly maintain both" and therefore was not immune to

negligence claims. Mei v. City of New York, 06 Civ. 296, 2006 WL 2997111 at *11

(S.D.N.Y. October 5, 2006).  Judge McMahon's decision was issued prior to discovery in

this case, in conjunction with the allegations that existed at that time, which included that

Defendant opened valves at the base of the Neversink Dam, releasing a torrent of water

into the River.  Discovery since has shown that no valves at the base of the Dam existed

and Plaintiffs have withdrawn this allegation.  (Pls.' Mem. in Opp. at 2-4.)  In

determining whether the City is shielded by municipal immunity, this Court must look to

the specific act or omission being complained of.  Miller, 467 N.E.2d at 496.  At this

stage in the litigation, the act complained of by Plaintiffs is the decision to repair the

Tunnel in 2005, which is a discretionary decision and therefore subject to immunity.  As

Judge McMahon explained, it is difficult to hypothesize a set of facts more implicating

governmental action than the operation of a water supply system.  Mei v. City of New

York, 2006 WL 2997111 at *11.

For these reasons, Plaintiffs' negligence claims must be dismissed.

---

[7] Moreover, as Plaintiffs assert, if the City is not immune from Plaintiffs' claims pertaining to its decision
to make these repairs, it would be subject to "the same principles of tort law as a private land owner."
(Pls.' Mem. in Supp. at 5.)  Defendant would therefore owe Plaintiffs the same duty New York law
imposes on all water-supply dam owners, whether they are government entities or private corporations; the
duty not to exacerbate the flood.  Iodice, 277 A.D. at 649, 652.  As discussed earlier, Defendant fulfilled
that duty.

III.    Endangered Species Act

Plaintiffs also bring a citizen suit under Section 11(g) of the Endangered Species Act, 16 U.S.C. § 1540(g) ("the ESA") and requesting declaratory and injunctive relief as well as attorneys' fees.  In the Amended Complaint, Plaintiffs allege that the City caused the dwarf wedge mussel to be "taken" as that term is defined by Section 3(19) of the ESA.  (Am. Compl. at ¶ 81.)  Plaintiffs argue that the flood caused significant mortality to the dwarf wedge mussel population in the Neversink River, and that the City has failed to adopt any steps to safeguard and protect the dwarf wedge mussel population.  Plaintiffs also contend that the City's failure to consult with the U.S. Fish & Wildlife Service with regard to the dwarf wedge mussel violated the ESA.

Defendant contends that Plaintiffs do not have standing to bring these claims because Plaintiffs have not asserted a concrete and individualized injury.  They also argue that because there is no genuine dispute as to whether the Dam attenuated the flood, Plaintiffs cannot show that Defendant caused a taking of the dwarf wedge mussel.  Finally Defendant contends that it has no duty to consult with the Fish and Wildlife Service under the Endangered Species Act.

Constitutional standing incorporates three elements.  Lujan v. Defenders of Wildlife, 504 U.S. 555, 560 (1992).  First, the plaintiff must have suffered an injury in fact.  Id.  This injury must be concrete and particularized, and actual or imminent, not conjectural or hypothetical.  Id.  In order to satisfy the requirement of having suffered an injury in fact, the plaintiff must show that he himself is among the injured.  Sierra Club v. Morton, 405 U.S. 727, 734 (1972).  Second, there must be a causal connection between the injury and the conduct complained of.  Lujan, 504 U.S. at 560. Third, it must be

likely, and not merely speculative, that the injury will be redressed by a decision in the plaintiff's favor.  Id. at 561.

Standing is an essential component of a plaintiff's case, and therefore must be supported with evidence sufficient to meet the standard required at the various stages of litigation.  Id. Defendant first challenges Plaintiffs' standing on the grounds that Plaintiffs have not established that they have suffered a concrete injury in fact.   In reply, Plaintiffs assert that they have suffered injuries to their aesthetic and recreational interests in the river as a result of the destruction of the dwarf wedge mussel and its habitat.  Harm to a plaintiff's aesthetic and recreational interests can give rise to an injury-in-fact and thereby satisfy the requirements for standing.  Summers v. Earth Island Institute, 129 S.Ct. 1142, 1149 (2009).  Generalized harm to an ecosystem, however, will not suffice to establish an injury in fact. Id.; see also Lujan, 504 U.S. at 565.  "In response to a summary judgment motion that challenges a plaintiff's standing, a plaintiff may not rest on allegations of injury, and must set forth by affidavit or other evidence the basis for which they assert standing."  Fund for Animals v. Norton, 365 F.Supp.2d 394, 406 (S.D.N.Y. 2005) (citing Lujan, 504 U.S. at 561).

Plaintiffs state in their Memorandum in Support that "most of them" "regularly enjoy" the Neversink River and "its aquatic life" for recreational or aesthetic purposes. (Pls.' Mem. in Support at 24.)  In opposition to Defendant's summary judgment motion, Plaintiffs further assert that "[m]ost Plaintiffs live alongside the River, and enjoy the daily benefits of a river that supports this ecosystem."  (Pls.' Mem. in Opp. at 10.) Discovery in this action is complete, and Plaintiffs have not submitted any deposition testimony, affidavits or other evidence demonstrating any specified interest, recreational,

aesthetic or otherwise in the dwarf wedge mussel.  The only evidence in the record that supports Plaintiffs' assertions of standing is the list of their addresses appended to the Amended Complaint, demonstrating that they own property in the vicinity of the Neversink River.  (Am. Compl. Ex. C.)   While Plaintiffs seem to assume that their property's vicinity to the River adequately establishes their recreational and aesthetic interest in the dwarf wedge mussel, they have submitted no evidence demonstrating that they have a particular interest in the mussel.[8]  The failure of Plaintiffs to submit any specific evidence demonstrating that they have suffered an injury to a cognizable aesthetic or recreational interest in the dwarf wedge mussel requires that this cause of action be dismissed for lack of standing.  See Fund for Animals v. Norton, 365 F.Supp.2d at 406 (citing Sierra Club v. Morton, 405 U.S. 727, 736 (1972).)

Defendant also challenges Plaintiffs' standing to bring a claim under the ESA on the grounds that their alleged injury is not fairly traceable to actions taken by defendant. The requirement of causation "ensures that there is a genuine nexus between a plaintiff's injury and a defendant's alleged…conduct." Conn. v. Am. Elec. Power Co., 582 F.3d 309, 345 (2d Cir. 2009).  As discussed above, Defendant has established that the Dam did not exacerbate but instead attenuated the flood.  While it is unfortunate that the habitat of the dwarf wedge mussel was disturbed by the flooding, resulting in significant mortality among their species, Plaintiffs have not established that any acts or omissions of the Defendant caused the destruction of the dwarf wedge mussel.  Indeed, Plaintiffs have

---

[8] The types of evidence courts have found to establish a cognizable injury to aesthetic or recreational interests include affidavits attesting to the personal pleasure derived from observing the species in question, Fund for Animals v. Norton, 365 F.Supp.2d 394, 406 (S.D.N.Y. 2005) and evidence that plaintiff intended to visit the habitat of an endangered species for the purpose of viewing wildlife, Summers v. Earth Island Institute, 129 S. Ct. 1142, 1149 (2009).

presented no evidence that the damage to the dwarf wedge mussel would have been in any way different with no dam in existence.  Therefore, they cannot demonstrate that a genuine issue of fact exists as to whether any act or omission by Defendant caused a taking of the mussel under the ESA.

Finally, Plaintiffs contend that the City violated the ESA by failing to consult with the Fish and Wildlife Service.  Defendant argues that under § 7 of the ESA, federal agencies must consult with either the Fish and Wildlife Service or National Marine Fisheries Service to ensure that proposed federal agency action will not damage an endangered species or its habitat.  16 U.S.C. §1536(a).  The statute is specifically addressed to federal agencies, and therefore the City, which is not a federal agency, was under no duty to consult with the Fish and Wildlife Service.

## CONCLUSION

Summary judgment is granted in favor of the Defendant.  Plaintiffs have failed to establish the existence of a genuine issue of material fact as to Defendant's negligence, and Defendant is entitled to summary judgment on that claim as a matter of law. Plaintiffs lack standing to bring the asserted cause of action under the ESA, and Defendant does not have any duty to consult with the Fish and Wildlife Service.  The Complaint is dismissed and this case is closed.

IT IS SO ORDERED.


Dated: New York, New York

November _15_, 2010


Robert P. Patterson, Jr.

U.S.D.J.

Copies of this order were faxed to:

Steven Jay Spiegel
Douglas Jones
Eric Ossentjuk
Spiegel Legal, LLC
148 North Main Street
Florida, NY 10921
(845) 651-5000
Fax: (845) 651-5111

Boris Sorin
Sylvor & Richman, LLP
605 Third Avenue
New York , NY 10158
(212) 972-1100
Fax: (212) 983-5271

Scot C. Gleason
Christopher John Murdoch
New York City Law Dept. Office of the Corporation Counsel
900 Sheridan Avenue
Room 6A14
Bronx, NY 10451
(212) 788-2912
Fax: (212) 788-2597, (212) 788-8887